

Lawrence M. Meadows, Pro Se
203 N. LaSalle St.
Suite 2100
Chicago, IL 60601
Telephone: (312) 917-6214
Facsimile: (435) 604-7850
lawrencemeadows@yahoo.com

**F I L E D**

AUG 0 3 2015

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **IN THE MATTER OF** | |
| **LAWRENCE M. MEADOWS,** | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Plaintiff. | |
| v. | |
| **AMERICAN AIRLINES, INC.,** | |
| a Delaware Corporation, | |
| **ALLIED PILOTS ASSOCIATION,** | **Case No: 1:15-cv-03899** |
| a Texas Labor Association, | **Honorable Manish S. Shah** |
| **MARJORIE POWELL,** | |
| and, | |
| **DOES 1-18** | |
| Defendants. | **Jury Trial Demanded** |

        **COMES NOW**, the Pro Se Plaintiff, Lawrence M. Meadows, who hereby, files

the following Complaint and sues Defendants and states as follows:

## I. JURISDICTION AND VENUE

Plaintiffs' claims are filed pursuant to 28 U.S.C. § 1331 and § 1343 in that this suit seeks to enforce the 1) Railway Labor Act, 45 U.S.C. § 151 *et seq.*, 2) Americans with Disabilities Act Of 1990 As Amended ("ADA"), 42 U.S.C. § 12101 *et seq.*, 3) Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001 *et. seq.,* 4) Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") Sec. 922, 15 USC § 78u-6(a)(6), 5) Civil Conspiracy. Venue is proper under 28 U.S.C. § 1391, as Defendants have substantial contacts in the state of Illinois, including a main hub of operations and pilot crew base domicile, and Plaintiff resides in, and has substantial contacts in the state of Illinois, and thus subject to personal jurisdiction.

## II. PARTIES

1.       Plaintiff, Lawrence M. Meadows ("Meadows') resides in, and has substantial contacts in Illinois. He is a member of the class and craft of pilots, and an *"Employee"* of defendant American Airlines, Inc., and as defined under U.S.C 45 §151- Fifth. Railway Labor Act ("RLA"), and a *"Qualified Individual"* as defined under the ADA, 42 U.S.C §12111(4) and (8), and a ERISA *"Plan" participant.*

2.       Defendant, American Airlines, Inc. (hereinafter, "American", or "Company"), is a foreign corporation with substantial business contacts in Illinois, including a main hub of operations, and a pilot crew base domicile, and an air *"carrier"* as defined under RLA § 1 First, (45 U.S.C. §151), and is also a *"Covered Entity"* as an *"Employer"* as defined under the ADA, 42 U.S.C §12111(2) and (5).

3.       Defendant, Allied Pilots Association, (hereinafter, "APA", or "union"), is an unincorporated association, and labor organization, headquartered in Texas, with a union

domicile and members in Illinois, and is the exclusive *"representative"* of all pilots at American Airlines, Inc., as defined under 1 Sixth of the RLA, 45 U.S.C. § 151.Sixth.

4.   Defendant, Marjorie Powell, is an individual who resides in Texas, where she works in the Legal Department for Defendant American Airlines, Inc.

5.   Defendants, DOES 1-18, are unknown at this time.

### III. STATEMENT OF FACTS

6.   Plaintiff, Lawrence M. Meadows brings this lawsuit against the above referenced defendants, and further alleges that alleges that; I.) his *"Employer"* American Airlines engaged in an ongoing (*post-commencement*) systemic practice of disability discrimination and retaliation, which have giving rise to disability harassment and a hostile work environment, primarily by enforcing an unlawful "no-leave" policy in violation of the American's With Disabilities Act of 1990 As Amend ("ADA") 42 U.S.C. §12101; thereby treating him disparately and discriminating in the terms, conditions and privileges of employment the basis of his medical disability; including but not limited to denial of ADA rights of Job protection, and valuable travel and pension benefits, II.) American has unlawfully refused to provide a *""Reasonable Accommodation" "* of reassignment to a non-flying position, or alternatively for additional medical leave to provide Job Protection and ensure Meadows return to his original relative position on the pilot System Seniority List in violation of the ADA, III.) American denied Meadows prejudgment interest on unpaid disability benefits which he was untimely paid, pursuant to ERISA, § 502(a)(3)(b), 29 U.S.C. § 1132(a)(3)(B), IV.) American improperly denied additional benefits under ERISA §502(a)(1)(B), 29 U.S.C. § 11329a)(1)(B), V). American owes Meadows attorney's fees pursuant to ERISA § 502 (g)(1), 29 U.S.C. § 1132(g)(1), VI.) American Breached Meadows

rights under the collective bargaining agreement ("CBA"), necessitating a Judicial

Determination of his individual Grievance 12-011, VII.) American and Ms. Powell retaliated

against Meadows for engaging in protected activity in Violation of the Dodd Frank Act.

VIII.) American, APA, Ms. Powell have engaged in a Civil Conspiracy and colluded to

deprive Meadows of his substantial statutory rights.

## BACKGROUND
### *Employment History*

7.          Meadows graduated cum laude from Embry-Riddle Aeronautical University in

1985, with a B.S. Degree in Aeronautical Engineering. Upon graduation, he was

commissioned Officer in the U.S. Air Force, where he served honorably for six years as a

military pilot flying T-37, T-38 supersonic training jets, and C-9A aeromedical airlift aircraft.

### *Meadows Has A 23 Year Continuing Employment Relationship With American Airlines*

8.          Meadows was hired by Airlines in October 1991, as a *"Cockpit Crewmember",*

and placed on American's Pilot System Seniority List, and served as a *"Pilot Employee"* in

the non-flying position of Flight Engineer on the DC-10 aircraft.

9.          Meadows subsequently upgraded to First Officer, where he continued to serve as

a *"Pilot Employee",* in a line pilot position of First Officer, piloting B-727, MD-11, and B-

777 aircraft.

10.         Meadows is and has been at all times a member of the craft or class of pilots

employed by American, who are represented by the Allied Pilots Association ("APA"), as

the certified exclusive bargaining *"Representative",* as provided under the Railway Labor

Act, 45 U.S.C. §151 Sixth.

11.         Meadows is and has always been model employee with over 8,500 incident free

hours of commercial flying; 1) He never had any employee discipline or performance issues,

nor any negative entries in his Personal Employment History ("PEH") file, 2) he never had

any flight training deficiencies, nor busted (failed) any simulator or inflight "Check-rides"

(pilot evaluations), and 3) he never had any incidents, accidents, nor certificate violations in

his Federal Aviation Administration ("FAA") records.

12.      Ever since American hired Meadows, he has been a *"Participant"* who

continuously accrued over 23 years of *"Credited Service"* as a *"Pilot Employee",* with no

breaks in service, serving in the status of either Active, disability benefits as provided under

the terms of the Pilot Retirement Benefit Program *("Program"),* or disability benefits under

the 2004 American Airlines, Inc. Pilot Long Term Disability Plan ("Plan" or "LTD"), as

negotiated under the Collective Bargaining Agreement ("CBA"), and as reflected on his

December 2014 Pension Benefit Statement.

13.      Currently, Meadows is considered both *"Employee"* an*d "Pilot Employee",* under

the CBA, Letter KK, and the terms of the *"Plan".*

14.      Meadows is paid *"Compensation"* subject to federal tax withholding in the form

of W-2 *"Employee"* Wages, as defined under the CBA, Letter KK, and the *"Plan".*

15.      Meadows also receives *"Active Pilot Employee"* Medical Plan, Dental Plan, and

Life Insurance Benefits, and accrues pilot *"Pension Credited Service"* as provided under the

terms of the CBA, Letter KK and Supplement-K.

16.      On September, 28, 2011, Meadows Chief Pilot Superior, Capt. Robert Raleigh,

awarded him 20year service pin, and a letter which stated in part;

> "I want to congratulate you on 20 years of service with American Airlines...I wish you
> many more years of career success, good health, and enjoyment of the best job ever."

17.     As of July 2012, American's records showed that Meadows remained on the pilot system seniority list, some seven months after commencement of its Bankruptcy proceedings.

18.     Moreover, on October, 24, 2013, highly respected RLA and MLB Arbitrator Professor Stephen Goldberg, awarded Meadows a full share payout of American's $1B bankruptcy settlement Equity Distribution, on the basis that he considered Meadows to be a *"Pilot Employee"* who should on *"Pilot System Seniority List"* as of January 1, 2013, and that he was further owed a duty of fair representation by the APA, holding in part;

> *"FO Meadows filed a grievance in February 2012 alleging that the reason why American removed him from the seniority list was not that he had been on sick leave for more than five years (which would have called for his removal in 2009), but because he had filed a 2011 Sarbanes-Oxley complaint against American...In sum, then, it is reasonable to assume that if the grievance is sustained, FO Meadows would be treated by the arbitrator as a pilot who should have been on the seniority list on January 1, 2013, the date on which pilots on the seniority list are eligible for recovery from all four silos, even if they were on LTD status."*

19.     As shown in ¶¶ 10-21 above, to date, for over the past 23 and half years, Meadows has continuously has remained in *"Continuing Employment Relationship"* with American, as both an *"Employee"* and *"Pilot Employee"*.

### *Disability History-Original Claim under "Program"*

20.     In June 2004, Meadows began suffering from a debilitating psychiatric *"Disability"*, and American's Corporate Medical Director approved him for collectively bargained pilot long term disability benefits, payable under American's Pilot Long Term Disability Program ("LTD" or "MDSB") , as funded by American's pilot pension plan.

21.     At that same time the Corporate Medical Director, had also approved Meadows for non-revenue travel benefits while on disability, which is usually provided to such pilots.

22.     On July 1, 2004, Meadows' Chief Pilot later issued him a blanket Travel Authorization Letter, allowing him to continue to use his travel benefits while on disability.

23.     Thereafter, every 190 days, the Chief Pilot regularly updated Meadows travel authorization while absent status, to specifically "*Allow Trips anywhere system wide during authorization period.*", with stated reason for travel as *"Special Consideration: Employee on LTD status."*

24.     On December 27, 2007, American's Corporate Medical Director abruptly terminated Meadows disability benefits without cause or notice, despite his doctor's timely submitted medical updates reports showing no improvement in his disabling medical condition. Only three years later did Meadows discover that his benefits were terminated under *"pilot disability cost savings"* scheme.

25.     American's pilot CBA Supplement-F requires, that, *"Any disputes arising as to the clinical validity of a claim or as to the continuation of disability defects, once commenced, shall be referred to mutually agreed-to clinical source."*

26.     However, American's Pension Benefits Administration Committee ("PBAC") breached that CBA requirement, by selecting a non-clinical pilot disability claims reviewer, Western Medical Evaluators ("WME"), which was nothing more than a father and daughter administrative medical billing service, consisting of only 5 clerical employees.

27.     On March 21, 2007, the PBAC unilaterally signed a contract with WME, despite it being rife with fraud and procedural irregularities.

28.     The PBAC, ignored the public facts that WME was rife with fraud and procedural irregularities; 1) its Corporate Medical Director, Dr. Howard Douglas, medical license was revoked by the Texas Medical Board, *"due to* unprofessional or dishonorable conduct that is

likely to deceive or defraud the public…", 2) its Office Manager was a convicted felon, 3) it

paid sub-contracted "independent" doctors 120% of the normal exam fee, if they denied

employee disability claims as possible, 4) its employees testified that its owner, Ms. Barbara

Douglas, who had no medical degree, fabricated and forged doctors reports, and 5) it had

engaged in fraudulent medical double –billing scheme and defrauded its factoring service.

29.          After Meadows appealed his benefits termination to American's PBAC, they sent

his disability claim to "independent" reviewer, WME, who denied his claim on June 8, 2008.

30.          Shortly thereafter, on June 19, 2008, American's Corporate Medical Director, Dr.

Thomas Bettes, acting in a non-supervisory capacity, e-mailed Meadows' Chief Pilot

superior, and outrageously  suggested Meadows be disciplined and stripped of his travel

benefits, solely on the basis of his medical disability;

> *"In Meadows' case, he probably does not have a current FAA medical certificate,
> and it would probably take some months before he could obtain one even if he
> were so motivated. Probably the best suggestion would be to <u>place him on unpaid
> sick</u> or a few months (3-6), <u>restrict his non-rev travel (although there is no strict
> medical reason for doing so), and <u>consider some sort of disciplinary action</u> if he
> has not made progress to that end."*

31.          Dr. Bettes, exhibited animus towards Meadows, and willfully and maliciously

acted outside the scope of his authority, under the CBA Section 21.

32.          Only a Chief Pilot superior can discipline a pilot for cause, and even then only

after an full investigation and formal hearing.

33.          Additionally, on that same day Dr. Bettes, also sent an internal email to several

senior managers in the medical and pension departments,  wherein he acknowledged that if

the Medical Department examined Meadows it would risk having to acknowledge his

disability and once again pay his benefits;

"*We have not received any updated information or correspondence from L.*
*Meadows #332713, since his LTD was denied and denial upheld by the PBAC,*
*and therefore we have nothing to confirm his sick status and it should probably be*
*"unapproved" at this time. Neither though have we requested any information*
*from him. Sick approval status is a new and uncharted territory for us in Medical;*
*we have no formal guidelines on how to manage their sick status.... There is also*
*the risk that should AA Medical get involved in his post-LTD monitoring that*
*we will enable him to go back to a paid disability status. So caution is advised.*
[Emphasis Added]. Exhibit 1.

34.     Dr. Bettes admitted that American had no formal guidelines on how manage the

status whose disability benefits were terminated, but remained medically disqualified and

unable to hold an FAA Airman's Medical certificate.

35.     One month in later July 2008, after reviewing and denying Meadows' and four

other American pilot's disability claims, WME was shut down by the Texas Insurance Board,

and its principals were indicted for felony medical claim fraud.

36.     American canceled WME's contract within one day of its indictments, but never

notified any of the adversely affected pilots, who lost their benefits at the hand of WME.

37.     In July 2010, Meadows filed an ERISA lawsuit protesting the PBAC's denial of

his original disability benefits claim under the *"Program",* which was based on two

purportedly" independent" doctor's reports provided by WME.

38.     One of those WME doctors has since provided affidavits stating that WME's

reviews of Meadows and two other disabled American pilots, *"were not of her doing."*

39.     Now WME is defunct, and its principals are serving five years in federal prison,

for three convictions of felony medical claim fraud.

### Pre-petition
### Disability ADA Discrimination/ SOX Retaliation

40.     On March 23, 2011, Meadows was conducting depositions of American's

Corporate Medical Director, Chief Nurse, and Senior Budget Analyst. He learned that his

benefits were terminated under the *"Nurse Case Management Pilot Disability Cost Savings"* scheme, which used reports containing highly structured actuarial calculations to determine how much money could be saved by terminating certain pilot's benefits prematurely.

41.      Regardless, the next day on March 24, 2011 the district court abruptly granted Americans' summary judgment, upholding Americans' termination of Meadows disability claim, albeit before any of the evidence of WME's fraud or Americans' pilot disability cost savings scheme in the record.

42.      On June 15, 2011, given that district court's ruling and the fact that American denied the existence of Meadows *"Disability"*, he sent a certified letter to American's Corporate Medical Director, requesting a *Fitness for Duty* physical examination and a *Return to Work* medical clearance as provided under the CBA Section 20. Or alternatively, he requested a re-review to verify the existence of his disabling condition by American's new claims reviewer (WME's replacement), the Mayo clinic. Both requests were ignored.

43.      Meadows believed that Americans' implementation of the *"Pilot Disability Nurse Case Management Cost Savings"* scheme, which was further facilitated through the use of a fraudulent reviewer, WME, was designed to intentionally underfund rightful pilot disability benefits to aide with American's grossly underfunded pilot Pension/Disability Plans. Which annual SEC 10-K reports showed to be underfunded by as much as $3.2B.

44.      Therefore, Meadows reasonably believed that American artificially inflated its corporate earnings, giving rise to securities fraud under the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1414A *et. seq.*

45.      On July 18, 2011, during an 11th Circuit mediation of his ERISA disability Case, Meadows' engaged in protected whistleblower reporting activity, under the SOX Act, and

informed American of his intent bring additional claims related to securities fraud, based on American artificially inflating its earnings through its *"pilot disability cost savings"* scheme.

### *Systemic Practice of Enforcing an Unlawful "No-leave Policy" to Discriminate and Retaliate Against Undesirable Disabled Employees*

46.     Just two weeks later, on August 5, 2011, on information and belief Senior Attorney Marjorie Powell retailed against for Meadows engaging in protected whistleblower activity. Ms. Powell sought to silence Meadows and get rid of him, before he exposed her participation and attempts to cover-up her and American's involvement in securities and corporate fraud, resulting from the pilot disability cost savings scheme.

47.     On information and belief, Ms. Powell acted outside the scope of her authority, by fabricating a false termination letter, and she further directed a non-supervisory administrator, Scott Hansen, to also acted outside the scope of his authority, to sign and send said letter to Meadows; which threatened his employment would end within 60 days, unless he obtained FAA medical certification to serve in the cockpit as an active pilot.

48.     That was an unreasonable demand, especially considering the Corporate Medical Director had previously informed Meadows supervisors that it could take him many months to obtain FAA medical certification.

49.     Further, the letter sought to selectively reinterpret the terms of the CBA, and enforce an un-lawful "no-leave" policy which is otherwise strictly prohibited by the ADA. Additionally, nowhere does the plain and unambiguous written language of the CBA provide for a disabled pilot's administrative termination or permanent removal from the seniority list.

50.     That letter written by Ms. Powell, and signed by Mr. Hansen, was also never provided to Meadows union representative, in unlawfully attempt to "direct deal", and circumvent Meadows right to union representation on that matter.

51.         Additionally, that letter in was in violation of CBA, and because it ignored all of Meadows contractual due process rights investigation, formal hearing and union representation. In particular only the CBA Sec. 21.B Provides that a Chief Pilot superior can terminate a pilot for cause, stating in relevant part;

> "A pilot shall not be disciplined or dismissed from service with the Company without an investigation and written notification of such action, including the precise charge(s) and an explanation for any action taken. A pilot shall be provided with an opportunity to meet with that pilot's Flight Department supervisor prior to the rendering of the Company's decision with regard to discipline or dismissal…A pilot shall be entitled to Association representation,"

52.         Moreover, American never gave Meadows advance notice that it intended to remove in from seniority list after five years of disability, and didn't do so until Mr. Hansen's letter sent after almost 8 ½ years being in a disability status.

53.         To the extent American alleges it had such a contractual right to remove Meadows from the Seniority list after 5 years, it failed to timely exercise it, and thus, should be deemed to have waived such right under the doctrines of waiver, laches, and estopple.

54.         Regardless, American's long standing past practice has been to reinstate all pilots who later become medically qualified to serve in the cockpit.

55.         On September 12, 2011, Meadows filed an "SOX" Whistleblower complaint, to report American's securities fraud resulting from the *"pilot disability cost savings"* scheme.

56.         On September 14, 2011, Meadows at his own expense was evaluated by the Mayo Clinic who verified the existence of his continuing disability.

57.         Using the Mayo's evaluation reports, Meadows re-applied for disability benefits with American Airlines, as he was on the *"Pilot System Seniority List"*, and still considered an Active *"Pilot Employee"* under the terms of the *"Program"* and the "Plan."

58.        Additionally, on October 17, 2011, Meadows returned to the Mayo, and was evaluated by its Chief of Aerospace Medicine, and underwent and successfully completed Federal Aviation Administration ("FAA") Airman's First Class Medical Certificate examination.

59.        However, due to the existence his underlying disability condition and medication required to treat it, the Mayo deferred final approval to FAA headquarters, and requested a special issuance certificate.

60.        On November 4, 2011, Meadows verified via American's on-line pilot's website that he was still on the pilot system seniority list.

61.        On November 4, 2011, Meadows contacted Scott Hansen, to inform him that his FAA medical certification was still pending, and sought to confirm his employment status, but was shocked to learn that American had allegedly removed Meadows from the "*Pilot System Seniority list*" and purportedly administratively separated him on October 24, 2011, before waiting on the final decision on his pending application for a FAA Airman's' Medical Certificate.

62.        Contrary to Hansen's assertions, as of November 11, 2014, American's Flight Department records still showed Meadows to be on the pilot system seniority list.

63.        On November 8, 2011, after Meadows complained to his union base reprehensive, the APA's Legal Director informed him via certified letter, that he was in fact not terminated, stating in part;

> "***let me clarify the Company did not terminate you***; *rather,*" [you were simply] "*administratively you were dropped from the seniority list, [which] differs from being involuntarily terminated, which is a considered a 'permanent separation.' Among other distinctions should you obtain your First Class Medical you may request a return to active status…**Certainly should you obtain your First Class Medical Certificate and wish to return to the seniority list in the future, APA***

***will assist you in the process of requesting your return to the seniority list.***"
[Emphasis Added].

64.     To date Meadows never received any sort of "*final, definitive, and unequivocal notice*" of discharge or termination from a Chief Pilot Superior. "*'Final' and 'definitive' notice is a communication that is decisive or conclusive, i.e., leaving no further chance for action, discussion, or change.*", and  Unequivocal' notice means communication that is not ambiguous, i.e., free of misleading possibilities." See *Coppinger-Martin. Nordstrom, Inc.*, ARB 07-067, 2007-SOX-019 (ARB Sept. 25, 2009).

65.     American's false assertions that Meadows employment was administratively terminated are unsubstantiated, not supported under the terms of the CBA, and contradicted by his bargaining representative's legal director.

66.     No court, arbitrator, board, ALJ or other neutral adjudicator has never heard, much less decided the issue of Meadows disputed to employment and seniority status.

67.     According to a former corporate executive, Hansen's letter was nothing more than an intimidation tactic, fabricated by American's Senior Attorney Marjorie, who was acting outside the scope of her authority, done in violation of the CBA; in underhanded effort to circumvent Meadows statutory and contractual rights, and silence my whistleblower activities.

68.     American's own internal records showed Meadows to still be on the pilot seniority list through July 2012, some seven months after commencement of its bankruptcy filing, and ten months after his purported removal.

69.     Subsequently, on September 12, 2012 Meadows timely filed his first EEOC charge, # 540-2012-03194f or discrimination on the basis of his medical disability.

**Meadows Was A Qualified Individual But His Requests For Accommodation Were Denied**

70.     During above reference timeframe, between August thru December 2011, Meadows condition was treated and in remission, but his condition and medication were still considered disqualifying by the FAA, who on December 23, 2011 denied issuance of an Airman's First Class Medical Certificate.

71.     Regardless, Meadows remained a *"Qualified Individual* who meets all of, American's published *"Essential Job Functions of an American Airlines Pilot."* (Exhibit 1).

72.     Accordingly, between mid-August and October 2011, and continuing post-petition Meadows made several phone calls, emails, and letters engaging in the *interactive process* with Americans' Director of Flight Administration. Wherein, he made multiple requests for a *"Reasonable Accommodation"* for reassignment to a non-flying job in the pilot's bargaining unit; or alternatively, for additional medical leave. But American refused to provide any sort of accommodation, and instead purportedly terminated him and removed him from the seniority list by enforcing an unlawful *"no-leave"* policy.

73.     There are at least six non-flying positions available within Americans' Flight Department and pilot bargaining unit, which Meadows could perform without an FAA medical certificate; including but not limited to, X-Type Check Airman (simulator only), Base Chief Pilot, Flight Operations Technical, or B-777 Fleet Specialist, Ground School Instructor, or Electronic Flight Bag I-pad Custodian.

74.     The ADA and provides a statutory basis for "Reasonable Accommodation", an requires that an employer must engage in accommodative practices, which include job restructuring or job sharing, Here American could modify an X-type's annual Line Rotation requirement to fly 73 hours under CBA 12.B.9.d.(1), by allowing Meadows to exchange his required flight hours with another Check Airman's simulator hours.

75.     There is also a regulatory basis for Meadows to be Reasonably accommodated as a X-type Check Airman, FAA regulation, 14 C.F.R. 61.23(b)(7), provides that an <u>Airman's Medical certificate is not required,</u> "*When serving as an Examiner or check airman and administering a practical test or proficiency check for an airman certificate, rating, or authorization conducted <u>in a glider, balloon, flight simulator, or flight training device.</u>*"

76.     In fact commercial flight training centers, such a Boeing Co. or Flight Safety International, routinely employ medically disqualified pilots as FAA approved TCE (training Center Evaluator) positions, which is identical to American's X-type Check Airman jobs.

77.     Further, there is a contractual basis to grant Meadows a Reasonable Accommodation. American's pilot CBA Sec 12.B.10., provides that a, *<u>"Check Airman placed on disabled status, will be given the choice of remaining as a Check Airman, and that the company has the ability to address special situations on an ad hoc basis."</u>*

78.     In fact, American has longstanding past practice of contractually reassigning medically disqualified pilots, at least for those without psychiatric conditions, into non-flying positions in the pilot bargaining unit with fully pensionable pilot pay.

79.     Thus, there exists a statutory, regulatory, contractual, and past practice basis, for medically disqualified by pilots, to be given *Reasonably Accommodation* of reassignment to a non-flying within pilot the bargaining unit, at fully pensionable pilot pay.

80.     On November 10, 2011, AA's Medical Supervisor, sent an email to other AA Administration Employees advising, *"Lawrence M. Meadows, #332713, has been approved for disability 11/9/11; date of disability 4/25/03 (per S. Hansen). Employee's condition will be adversely affected by airline travel."* [as per Corporate Medical Director]

81.     Just one month later on November 29, 2011( "petition" date), American's parent

corporation, AMR Corporation,  filed voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code,  and the Bankruptcy Court  entered an Order authorizing  payment of

prepetition all employee wages and benefits.

### *Post-Commencement*
### *Meadows Second Disability Benefits Claim Is Approved*

82.     On December, 13, 2011, American partially approved Meadows second claim for

disability under company funded, 2004 American Airlines, Inc., Pilot Long Term Disability

Plan *("Plan"),* which is governed by ERISA. Albeit, not under the pension funded

*"Program"* as he originally received and applied for this second time, denying four years of

retroactive benefits.

83.     Regardless Additionally, American denied him four years retroactive payment of

benefits that should have otherwise been paid, denied him active medical and dental

otherwise provided under the *"Plan",* denied g him reinstatement of pension credited

service, and denied him travel benefits.

84.     The terms of CBA, Letter KK, and the *"Plan"*, define Meadows as an

*"Employee"* and *"Pilot Employee."* Further only *"Active Pilot Employees"* are eligible for

disability benefits, so Meadows had to be deemed in Active status to be approved for them.

85.     However, this time American's Corporate Medical Director explicitly denied

Meadows for non-travel benefits, without examination or just cause, despite Meadows

condition being due to the same underlying illness that existed when he was previously

approved for travel.

86.     Meadows subsequently timely filed an appeal of his second disability claim to

American's PBAC, on the basis of American's Corporate Medical Directors partial denial of

his four years of retroactive disability benefits, pre-judgement interest on those benefits, denial of active medical, dental and life insurance benefits to which he was entitled under the *"Plan",* denial of four years of out-of-pocket medical costs he otherwise incurred, denial of his pension credited service, and denial of his travel benefits.

87.     Both *"Plan"* Summary Plan Document ("SPD"), required the PBAC to process Meadows second PBAC disability claim appeal within 45 days. However, American delayed decision on the appeal for over 300 days, and didn't act until Meadows filed a second EEOC charge, and complained to the Employee Benefit Security Administration ("EBSA").

88.     Finally, on July 31, 2013, American's PBAC, based on the expert medical options of, their new disputed claims review doctors at University of Texas Medical Branch Galveston (UTMB), awarded Meadows four years of retroactive disability benefits payments, reinstated his pension credited service, and promised him active medical/dental benefits (but did not provide them), but refused to pay his claim for prejudgment interest or provide him travel benefits.

89.     Not until, June 2014, after another year of fighting, did American reimburse Meadows approximately $38,000 for out-of-pocket medical cost incurred while uninsured, and actually enroll him in the Active *"Pilot Employee"* medical and dental plans.

90.     To date, the PBAC and American, have still refused to pay prejudgments interest on untimely paid disability payments, provide travel benefits normally provided to disabled under the *"Plan"* and CBA, and failed to reimburse Meadows the attorney fees he was forced to expend enforcing his ERISA rights under the "Plan".

91.         Meadows has fully exhausted his administrative remedies as provided under the

*"Plan"* SPD, and hereby exercises his right to sue American for its *post-petition* violations of

ERISA.

### Meadows Individually File Company Grievance 12-011

92.         As the result of Americans removal of Meadows from the "Pilot System Seniority

List", the APA placed Meadows in MDD (Medical Disability Dropped from AA) status

effective October 24, 2011. Further, APA's Board of Directors has issued a directive that

MDD pilots, to include Meadows, are not considered to be members of APA, and not entitled

to APA benefits.

93.         Thus, on February 4, 2012, without APA assistance or support, Meadows was

forced to individually file his Grievance #12-011. Wherein he asserted, that he was

purportedly improperly removed from the pilot seniority list and discharged in violation of

the CBA Sec. 21. Additionally, that grievance explicitly cited motivating factors of

retaliation in violation of the SOX Act, and disability discrimination, in particular

enforcement of an unlawful "No-leave" policy, and refusal to provide a "Reasonable

Accommodation"  in violation of ADA.

94.         The Bankruptcy Court entered the Bar Date Order and established the Bar Date as

July 16, 2012 the ("Bar Date").

95.         APA's Secretary Treasurer had informed Meadows that APA would be filing a

proof of claims,  that would cover all pilots' claims, with the exception of disability

workman's comp, stock option, or individual business claims.

96.         Accordingly, on March 14, 2012, in reliance of APA's representations Meadows

timely filed a personal proof of claim for his legal and administrative claims related to his

original claim for "Pilot Long Term Disability Benefits." Under the "Program" which was denied in December 2007.

97.      On July 13, 2012, Meadows' pilot union, the Allied Pilots Association, also timely file a proof of claim, preserving Meadows Grievance #12-011 by reference, which explicitly included his ADA discrimination and SOX retaliation claim.

98.      On September 12, 2012, Meadows filed EEOC Charge no. 540-2012-03194 against his employer American Airlines, Inc., for disability discrimination and retaliation, based on enforcement of an unlawful "no-leave" policy.

99.      On November 16, 2012 American and APA entered an Bankruptcy Settlement Agreement, in exchange for APA disposing of some 220 out of 260 pending pilot grievances, and a payment of $21.5M is stock and cash to defray APA's expenses of $10.5M. So APA netted almost $11M for doing so. The affected pilots were never provided notice that APA unilaterally disposed of their grievances.

100.     Meadows grievance was one only 36 that were excluded from the bankruptcy settlement, which American and APA incorporated CBA, and explicitly referenced it in LOA 12-01.

101.     On April 24, 2013, APA Legal department informed Meadows in writing that they supported the SOX claim portion of his grievance, and that as a matter of equity he should be made whole.

102.     On April 25, 2013, American's Exec. V.P. of Flight held a formal grievance hearing during which the APA staff attorney supported Meadows argument relating to his SOX claim. Meadows requested no-cost relief of reinstatement to the pilot seniority list,

reinstatement of his travel benefits, and a "Reasonable Accommodation" to another job in the pilot bargaining unit.

103.     On June 6, 2013, American denied Meadows grievance 12-011 citing he was properly removed from the seniority list in accordance with the CBA, but failed to address his improper discharge "termination".

104.     The APA protested the decision, and escalated the grievance to a Pre-Arbitration Conference ("PAC").

105.     On August 8, 2013, Meadows submitted his PAC brief, wherein he offered a global no-cost settlement; to include reinstatement to the pilot seniority list, reinstatement of travel benefits, and a *"Reasonable Accommodation"* to another job in the pilot bargaining unit. American continued to discriminate and denied Meadows' reasonable no-cost request.

106.     Two weeks after the PAC, the APA abruptly abandoned Meadows grievance, suddenly claiming it didn't raise any contractual claims under the CBA, and refused to proffer it to arbitration before a System Board, saying that Meadows could still continue to pursue in SOX and ADA claims in the appropriate federal forums.

107.     Under the ADA an Employer's duty to provide a *"Reasonable Accommodation"* is an ongoing one.

108.     Accordingly, on September 27, 2013, Meadows sent a comprehensive formal package to his supervisors in the Flight Department, showing he was a qualified individual and he requested a "Reasonable Accommodation" in the pilot bargaining unit, as was the longstanding practice for other medically disqualified pilots, albeit apparently only for

pilots who were not whistleblowers or suffering from a psychiatric disability. American denied said request, which amounted to further disability discrimination and retaliation.

109.     On October 10, 2013, Meadows submitted a formal 39 page administrative claim seeking reinstatement of his non-revenue travel benefits which he had previously enjoyed, but American ignored this claim. On manager told Meadows was told that these benefits were a privilege and that he didn't deserve them, because he was suing the company.

110.     Meadows also requested that Americans' Corporate Medical Director examine him as provided under Section 20 of the CBA, and issue for medical clearance to use non-revenue travel, but his request were ignored.

111.     Meadows treating doctor sent American an evaluation stating, that *"his condition would not be adversely affected by airline travel."*, and *"there are no impairment or limitations that would prevent Mr. Meadows from airline travel and that there would be no medical reason to restrict him from such travel."*

112.     There is no legitimate basis to deny Meadows travel benefits as previously enjoyed by himself and currently enjoyed by other pilots on long term disability; thus American's disparate treatment Of Meadows amounts discrimination on the basis of disability.

### Post-Confirmation Date - Disability Discrimination/Retaliation

113.     On October 21, 2013, the Bankruptcy Court entered an order confirming the Debtors' Fourth Amended Joint Chapter 11 Plan *("post-confirmation"* date), with an effective date of December 9, 2013 ("post-effective" date).

### Meadows Individually filed his second Grievance #13-064

114.     On October 31, 2013, without APA assistance/support, Meadows individually, filed a second company Grievance #13-064, this time specifically protesting his removal

from the pilot seniority list and termination as violations of Sec. 13 "Seniority" and Sec.
11.D.1 "Leave of Absence."

115.     Meadows took extra efforts to ensure that his valuable CBA, SOX, and ADA
claims contained in grievance 12-011 continued to be preserved. These claims provide for
make whole remedies including back pay/benefits, reinstatement, reasonable
accommodation, or forward pay/benefits in lieu of accommodation, which Meadows
economic expert valued at $5.069M, based on the 2013 pilots CBA.

116.     On January 17, 2014 Meadows put APA on written notice that he still had
valuable legal remedies that flowed from grievance #12-011and requested APA continue to
preserve that grievance as listed in APA's original Proof of Claim (POC) filing in American's
bankruptcy proceedings.

117.     On February 19, 2014 Meadows filed a hybrid lawsuit, in U.S. district court,
District of Utah, against American and APA wherein he sought injunctive relief to compel
arbitration of his grievance 12-011 and 13-064, as provided under the RLA 45 U.S.C §184.

118.     On February 27, 2014, American's Exec. V.P. of Flight held a formal hearing on
Grievance 13-064. Where once again Meadows requested no-cost relief to include
reinstatement to the pilot seniority list, reinstatement of travel benefits, and a "Reasonable
Accommodation" to another job in the bargaining unit. Once again American denied
Meadows requested relief.

119.     On Februarys 28, 2014 ,after his grievance hearing, Meadows went to corporate
headquarters to take advantage of new management's *"open door"* policy, where he had sit-
down meeting with the CFO and Chief of Corporate Affairs. Meadows provided them with
detailed documents showing their predecessors fraud related to the *"pilot disability cost*

*avings"* scheme and SOX retaliation and ADA discrimination, and asked that they initiate an investigation. He also left copies on the desks of American's President, and Chief of Human Resources

120.        While at headquarters, Meadows also met with Senior Attorney, Marjorie Powell, in her office. Even though he was represented by counsel, Ms. Powell spent the next two hours trying to convince Meadows that could settle his claims without counsel, and attempted to entice Meadows with a cash buyout. Further she told Meadows, *"You don't need to be a pilot. You know what I think? I think you missed your calling and should take the money and put yourself through law school."*

121.        Ms. Powell threatened Meadows, telling him in no uncertain terms that even if he managed to obtain an FAA medical certificate, she would terminate his disability benefits, but refuse to return him to the pilot seniority list. Further, she said that American would not be reinstating his non-rev travel or providing him any sort of "Reasonable Accommodation."

122.        When Meadows asked why Ms. Powell, stated *"Because we are not going to."*

123.        Ms. Powell also informed Meadows that she believed his personal proof of claim was untimely, and thus his *pre-petition* ADA and SOX claims was not timely preserved in American's bankruptcy proceedings, and threatened that unless he dismissed his SOX ALJ proceeding American would file an Objection to get it disallowed, forcing him to fly to New York and spend a lot of money.

124.        Meadows informed Ms. Powell that it didn't matter, because the APA's timely proof of claim preserved Grievance 12-011, which explicitly included his SOX and ADA claim.

125.     Just one week later, on March 7, 2014despite being noticed directly by Meadows

and via his Utah hybrid lawsuit to continue to preserve grievance 12-011, APA suddenly

amended its proof of claim without notice, and excluded Meadows's Grievance 12-011. On

information and belief Ms. Powell had conspired with APA's legal Director Bennett

Boggess, and other Officers and Agents of APA to accomplish this.

126.     Further on information and belief this was a disingenuous attempt by APA to

mislead the bankruptcy court Meadows grievance was fully disposed of, when in fact it was

not, and was and still is incorporated in to the January 31, 2015 version of the pilot's CBA.

127.     Moreover, it appears that APA wanted unwind its explicit previous support and its

own timely preservation of Meadows SOX claim (via its explicit reference in Grievance 12-

011), insure to American's benefit and to Meadows detriment.

128.     On March 6, 2014, the Dept. of Labor ALJ issued Order Rescheduling Hearing

(for Aug.18, 2014) and Revised Pre-hearing Schedule, which reopened discovery.

129.     On March 17, 2014, as per Ms. Powell's threat, American filed an Objection in

the bankruptcy court, seeking to disallow all of Meadows' claims including his EEOC charge

containing his ADA claim. Meadows timely filed a Response.

130.     On March 20, 2014, Meadows, engaged in protected whistleblower activity, and

sent American's new CEO and President, Mr. Doug Parker a certified letter which stated;

> *"New management cannot and should not ignore the fraud of its counsel, in its*
> *continued, but fatally flawed charade, and concerted effort to cover-up securities*
> *fraud violations under Sarbanes-Oxley Act."*

131.     On March 31, 2014 Meadows sent American's new CEO and President, a

second certified letter stating in part;

> *"I am hereby formally requesting that you initiate a Corporate Security*
> *Investigation into the above referenced fraud. Additionally, I request that you and*

> *the Board and appoint special outside counsel to conduct an external audit. Into my allegations of understated pension funding obligation liabilities, artificially inflated earnings, and resultant material misstatements American's SEC 10-K annual reports."*

132.     On April 7, 2014, American finally filed its Answer to the SOX Complaint, and also agreed to schedule depositions of two executive officers, but they ultimately got the Bankruptcy Court to stay them.

133.     On April 23, 2014, Meadows sent an updated employment application package, and once gain requested a "Reasonable Accommodation" to another non-flying position in the pilot bargain unit.

134.     On April 24, 2014, American once again treated Meadows disparately, and sent a letter denying his second request to decide his administrative claim seeking reinstatement of his non-revenue travel benefits.

135.     On April 14, 2014, U.S. Bankruptcy Court held a hearing into Americans Objection of Meadows' claims.

136.     During that hearing despite previously asserting Meadows was not a member and not owed a duty, APA's General Counsel, Steve Hoffman, and special Bankruptcy counsel, Joshua Taylor, made an no-notice appearance and argued against Meadows interest.

137.     Mr. Hoffman, misrepresented to the court that the APA did support Meadows SOX claim, and as a result the bankruptcy court determined that Meadows original SOX compliant was not preserved by APA's preservation of Grievance 12-011.

138.     Coincidentally, during Meadows hearing, the Bankruptcy Court heard another the EEOC discrimination case of American employee, Marceline Mesidor. Wherein, U.S. Bankruptcy Judge Sean Lane concluded that under the *"continuing violation doctrine"* that

American was culpable for any *post-petition* ongoing discrimination, and after the post-effective date, *"its sue and be sued, in the ordinary course of business."*

139.     The Bankruptcy Court, further held that Ms. Mesidor, could use her EEOC Right to Sue Letter that was issued based on her *pre-petition* charge, to sue American for its ongoing *post-petition* discriminatory conduct.

140.     Similarly here, the Bankruptcy Court confirmation Order, have could only discharged Meadows Claims for Americans' *pre-petition* discriminatory and retaliatory conduct.

141.     Further, here since American has engaged an ongoing systemic discriminatory and retaliatory practices in violation of the ADA, just like in Mesidors case, the *continuing violation doctrine* allows Meadows to use his EEOC Right To Sue Letter issued for *pre-petition* discrimination, to sue for Americans' *post-commencement* ongoing conduct.

142.     August 29, 2014, the Bankruptcy Court entered a bench ruling disallowing all of Meadows personal proof of claims, which included his pre-petition EEOC charge of his ADA claim and SOX claim, but notwithstanding that read American's proposed Order into the record stating that;

> "Meadows shall be permitted to arbitrate Grievance 12-011 before the System
> Board to the extent that such arbitration is limited in scope to claims involving the
> interpretation of the CBA and provides remedies, if any and if appropriate, that
> are customary under the grievance procedures created by the RLA. **"**

143.     Immediately thereafter, based on Bankruptcy Court's Order, American filed a status report with the Dept. of Labor ALJ, and sought dismissal of the SOX case. Meadows timely filed an Objection, and on October 14, 2014, the ALJ issued an Order Continuing Formal SOX Hearing "Sine Die", until Meadows' fully exhausts all appellate remedies of Bankruptcy Court's Order.

144. On September 5, 2014, Judge Lane without notice unilaterally modified the Order read into his bench ruling as follows;

> "Meadows shall be permitted to arbitrate Grievance 12-011 before the System Board to the extent *permitted by applicable law*;..."

145. On October 2, 2014, Meadows timely filed a Notice of Appeal of the Bankruptcy Court's Order. That Appeal is fully briefed and currently pending in the SDNY. If Meadows prevails his claims for American's *pre-petition* discriminatory conduct will not be discharged, and will become actionable at that time.

146. On January 30, 2015, the EEOC issued Meadows a 90 day Right to Sue Letter, for Charge No. EEOC Charge no. 540-2012-03194, which alleged discrimination on the basis of his medical "*Disability*. (Exhibit 2).

147. Accordingly, on April 30, 2015 (the 90th day) based on the *"continuing violation doctrine.",* Meadows filed his EEOC lawsuit for the *post-commencement* ongoing systemic disability discrimination and retaliation practices, to include disability harassment, which created a hostile work environment,

148. On January 31, 2015, the new American Pilot's 2015 CBA was implemented, which contains LOA-12-01, which explicitly excludes Meadows individual Grievance 12-011 from the BK settlement, incorporating it into the collective bargaining agreement.

149. Tellingly, since Meadows' made his original Allegations of SOX fraud, American's new executives appear to have taken steps to dismantle its *"pilot disability cost savings"* apparatus, first 1) by eliminating its Medical Director and two nurses involved in the scheme, 2) it replaced them with a third party disability claims administrator, 3) disbanded its PBAC, and 4) its former claims reviewer, WME, principals are now imprisoned for felony medical claim fraud.

150.     Or so it would seem…recently however in February of 2015, Meadows was shocked to discover that American's former Corporate Medical Director, Dr Thomas Bettes who orchestrated the *"pilot disability cost savings"* scheme, is now employed by American's new supposedly "independent" third party disability claims administrator, Harvey Watt Co.

151.     Thus, on February 18, 2015, Meadows once again engaged in protected SOX whistleblower reporting activity under both the SOX and Dodd Frank Acts, whereby he specifically informed American that,

> *"I reasonably believe that Dr. Bette's presence at Harvey Watt appears to perpetuate Americans' pilot disability "cost savings" scheme, and likely amounts to a continuing violation of the Sarbanes Oxley Act.*

152.     On February 10, 2014, Meadows attended a mediated Settlement Conference, along with American's Senior Attorney, Ms. Marjorie Powell, American's outside labor counsel, Mr. Todd Duffield of Ogle-Tree Deakins, and Mediator Sherman Fogel.

153.     During the Mediation Meadows, represented himself Pro Se, and once again sought a reasonable no-cost resolution, to include reinstatement to the pilot seniority list, *"Reasonable Accommodation"* consisting of reassignment to a non-flying job in his bargaining unit, and reinstatement of his non-revenue travel benefits; but American refused to uphold its ongoing duty to provide such accommodation or benefits.

154.     The parties failed to reach an agreement after over 13 hours of negotiating. Meadows thank everyone for their time, and on the way out the door Ms. Powell oddly gave him a hug goodbye. She further cautioned Meadows that if he didn't settle on American's terms, that there *"won't be another settlement offer, and American will just spend whatever it costs to litigate your claims."*

155.         During mediation and in subsequent communications, Ms. Powell Meadows assured Meadows that his disability benefits would be unaffected by the settlement, and that she had informed people involved with handling his claim that it was to be *"hands off",* and that, *"nobody is going to mess with your LTD benefits."*

156.         Disconcertingly, the implication of Ms. Powell's statement is that she somehow had control or influence the third party disability claim administrator, Harvey Watt & Co's, administration of my LTD claim. Which conversely implied that she could also alternatively influence people to put their hands on my claim, and interfere with or terminate my benefits. Which was made evident on April 24, 2015, when American abruptly stopped paying Meadows disability payments without cause or notice. (see ¶ 171 below).

157.         Shortly thereafter, a corporate insider informed Meadows of, the existence of American's *"Disability Strategic Committee", whose purpose* was to gut *"Employee"* LTD benefits and terminate existing disability claims. He was further told that American had discussed and intended to modify the LTD *"Plan",* to reduce benefits payable for only two years lifetime maximum, as opposed to the current through age 65 limit. So if Meadows settled his LTD benefits would likely have been eventually stripped away.

### *Meadows Recent SOX, AIR21, ADA and EEOC Protected Reporting Activity*

158.         On February 18, 2015, Meadows send a letter to Ms. Powell and Mr. Duffield, wherein he engaged in protected whistleblower activity stating;

> *"I informed you both during the mediation, I was particularly disturbed by my recent discovery that Dr. Bette's while serving as American's Corporate Medical Director was also simultaneously consulting directly for the American's new third party pilot disability claims reviewer, Harvey Watt, and continues to do so even after his departure from American... <u>At a minimum, given Dr. Bette's prior involvement with terminating pilots disability benefits using American's pilot disability "cost savings" reports (original SOX scheme), his continued involvement with Harvey Watt creates a legitimate concern for myself and other disabled pilots</u>*

*of further unwarranted terminations or disruptions of our rightful disability benefit claims...As a result, I reasonably believe that Dr. Bette's presence at Harvey Watt appears to perpetuate Americans' pilot disability "cost savings" scheme, and likely amounts to a continuing violation of the Sarbanes Oxley Act."*

159.　　　　During subsequent negotiations of a written settlement agreement, Mr. Duffield informed the Mediator and Meadows via email that his LTD benefits would remain unaffected by the settlement, but subsequently refused to guarantee such in the final language of the agreement.

160.　　　　On April 10th, 2015, the Mediator emailed Meadows American's revised settlement offer with an increased payout, but cautioned that; *"Since the deadline established by the company is next Wednesday* [April 15th] *at noon, **if you need to talk...you should feel free to call Marjorie and/or Todd directly."***

161.　　　　However, during this time frame Meadows had learned of Ms. Powell's unlawful conduct, to include fraudulent inducement and subsequent breach of another disabled pilots settlement agreement. He realized Ms. Powell was also fraudulent inducing him into a bad settlement. Accordingly, he ignored American's high-pressure tactics of repeated emails and calls, threatening to withdraw its settlement within five days, on April 15th.

162.　　　　Thereafter, on April 15, 2015, after Americans' settlement offer had expired, Meadows agreed to participate in speak telephonic settlement conference with Ms. Powell and Mr. Duffield. During which Meadows expressed his serious concerns, based on his recent discovery of Ms. Powell's fraudulent and unethical conduct in other employee settlement matters, and his resultant high level of distrust.

163.　　　　More specifically, Meadows informed Ms. Powell, that he intended to appear on national media outlets, and file a press release, exposing her and American's ongoing systemic retaliatory and discriminatory practices, and the resultant disability harassment

against himself and other disabled pilots, which created a *hostile work environment*. Thereby, making pilots suffering from mental disabilities reluctant to report their condition or seek needed treatment, and thereby incentivizing them to fly sick. He explained that unless American ceases such conduct it is planting the seeds for the next German Wings disaster.

164.    Meadows further informed Ms. Powell that he reasonably believed the original Sox fraud scheme was being perpetuated, by a newer but closely related *"pilot disability cost savings scheme"* involving Dr. Bette's and the new claims administrator, Harvey Watt, as well as other newly discovered but closely related violations shareholder fraud violations. Finally, he informed her that he would be filing complaints with the appropriate government agencies, to include an FAA AIR21 whistleblower complaint.

165.    Thereafter, Ms. Powell withdrew from any further communications with Meadows, and refused to participate in any subsequent teleconference, despite Meadows request for her to stay involved. Her subsequent silence spoke volumes as to her guilt.

166.    On April 16th, 2015, Mr. Duffield sent a revised settlement agreement to Meadows, with a ultimatum that it would be off the table by 5:00 pm May 1st.

167.    With the settlement discussions having finally failed, Meadows, on April 22, 2015, Meadows proceeded to file his Appeal Brief of U.S. Bankruptcy Courts Order disallowing his amended proof of claims, and also timely filed his ADA lawsuit in this Court based on his Right to Sue Letter dated 1/30/2015.

## Americans' Very Recent Post-Effective New Violations Of Discrimination and Retaliation In Violation of the ADA, AIR21, SOX, and Dodd Frank Acts

168.    Shockingly, on April 24, 2015, without notice, cause or due process, American suddenly ceased payment of Meadows regularly scheduled monthly pilot disability benefit

payment of $6000.00, which was previously always electronically deposited into his Fidelity

account on or around the 24th of every month.

169.    On April 29, 2015, Mr. Duffield sent Meadows a letter informing him that

American would be withdrawing its settlement offer on May 1st.

170.    Later that day, Mr. Duffield held another teleconference with Meadows, in a last

ditch effort to resurrect the settlement, albeit without Ms. Powell's participation. Mr. Duffield

refused to make her available, saying it would not be productive given Meadows recent

allegations of her unethical and unlawful misconduct.

171.    On the morning of May 1, 2015 Mr. Duffield informed Meadows via email that

American not agree to his proposed revisions to American's settlement offer, and that their

offer would be off the table by 5:00 pm that afternoon.

172.    Thereafter, on later that day,  Meadows attempted to contacted Ms. Powell, and

left  her a detailed voice mail as a *professional courtesy,* allowing her the opportunity to

discuss his allegations of  her unethical and fraudulent conduct, prior to him filing a bar

complaint against her. Meadows also informed her of the various legal actions he intended to

take against her and American Airlines if she did not respond by 5:00pm on May 4th;

including but not limited to an AIR21 Complaint.  In so doing, Meadows' engaged in

protected whistleblower activity under SOX, DF, and AIR21 acts.

173.    Additionally, during his voicemail to Ms. Powell, Meadows made one last good

faith attempt to resolve his claims and proposed to submit his claims final and binding

arbitration of his claims under Fed. R. Bnkr. P. 9019.

174.    On the morning of May 6, 2015, Meadows sent Ms. Powell a formal  seven  page

Notice Letter via FedEx,  putting her on notice of; 1) her duty to preserve all evidence, 2)

filing a 2nd SOX-WB compliant, 3) filing an AIR 21 complaint, 4) to cease and desist any communications with the FAA,  5) filing a Civil Conspiracy claim, 6) filing Civil Rico charges, 7) filing a Bar Complaint, and 8) also requested she initiate a Corporate Security Investigation and External Audit into his various allegations of corporate fraud.

175.	The evening of May 6th at 6:37 pm, Mr. Duffield emailed Meadows a letter, wherein he mischaracterized Meadows May 1st voicemail to Ms. Powell, as *"threatening and harassing",* and proceeded to threaten Meadows with *"sanctions or even criminal charges",* and further asserted that American *"will not hesitate to pursue its rights and remedies",* if Meadows contacted Ms. Powell or any other American employee. When in fact Meadows was simply making a further effort to settle, and putting Ms. Powell on firm notice of the legal actions he intended to bring against her and American, as referenced in his notice letter date May 6, 2015.

176.	A few hours later, on May 7th  at 12:38 am, Meadows responded to Mr. Duffield via email, informing him that, *"I deem your implied  threat of criminal charges or sanctions outrageous, and to be a threat of retaliation and intimidation for engaging in otherwise lawfully protected whistleblower reporting activity."* Meadows prided him a copy of the above referenced Notice Letter, which he had already sent via FedEx to Ms. Powell.

177.	On May 7th, 2015, Meadows received a Medical update request via regular mail, from American's third party disability claims administrator, Harvey Watt & Co., albeit not from the administrator officially assigned to his claim; which threatened that if Meadows doesn't provide a response within 30 days, *"This will result in the termination of your long term disability benefits under the* [LTD] *Plan."*

178.      Suspiciously, Harvey Watt sent yet another medical update letter to Meadows treating doctor, albeit from an entirely different claims administrator, which requested entirely different information, including diagnostic testing, even though American's clinical reviewers the Mayo Clinic and UTMB had already both verified Meadows diagnosis.

179.      Later that same day, and only after Meadows had filed his SDNY Bankruptcy Appeal Brief, his EEOC lawsuit, and put Ms. Powell American on Notice of Retaliation, did American finally relent and electronically deposit Meadows' April disability payment albeit two weeks late.

180.      On May 12, 2015, Meadows filed an AIR21 Complaint with the FAA, complaining;

> *"American's deficient policies and practices relating to the treatment of its pilots with disqualifying medical conditions is creating an unsafe aviation environment, and as result American is violating its statutory duty to provide the public air service with the highest possible degree of safety, in violation of  Title 49 United States Code, § 44702."*

181.      On May 15, 2015, Meadows sent Ms. Powell a demand  letter  stating;

> *" I must demand that you refrain any further threats, intimidation, or harassment via outside counsel , and stop infringing on my statutory rights...I wanted to provide you and American one final opportunity to comply with its statutory and contractual employee obligations. To that end, I respectfully demand; 1) Reinstatement to the Pilot System Seniority List, 2) Reasonable Accommodation of reassignment to a SLOA Special Assignment job in the pilots bargaining unit, 3) Reinstatement of my non-revenue travel benefits, 4) Compensatory damages... As I am otherwise entitled to under long-standing past practice, CBA, ADA, SOX and AIR21. Otherwise, I will continue to suffer from American's ongoing discrimination and retaliation, including but not limited to blacklisting, refusal to rehire, and denial of benefits, in violation the above referenced statutes. I will give you until Wednesday, May 20th, 5:00pm C.S.T., to respond and affirmatively approve my reasonable request."*

182.      On May 19, 2015, Mr. Duffield responded on behalf of Ms. Powell and American, and improperly mischaracterized Meadows Demand as a settlement offer.

Nonetheless, American refused to cease its retaliatory conduct and comply with Meadows statutory right, in violation of his AIR2-WB, and SOX-WB protections.

183.     Meadows replied to Mr. Duffield, informing him that his May 15th letter;

> "was in fact a simple demand letter seeking to enforce my statutory rights as otherwise provided under my recently filed AIR21 Complaint, including but not limited to reinstatement. I will take your letter to be Ms. Powell's response, and as representing American's refusal to comply with its duties and obligations as it relates to my statutory rights under AIR21, SOX, and the ADA. It is clear that American insists on blacklisting me, refuses to rehire me, and continues to deny my rightful travel and pension benefits."

184.     On May 20, 2015, American's Senior Manager of Benefits Compliance, Deborah Jameson, was viewing Meadows online Linked-in profile. Which seems very suspicious, considering, she was individual who had Meadows original disability claim reviewed and denied by a fraudulent third party reviewer, Western Medical Evaluators (now in prison for felony medical claim fraud).

185.     On May 21, 2015, Meadows spoke to the claims manager at Harvey Watt & Co., and followed up with a certified letter; expressing his serious concerns about the procedural irregularities in administering his claim, Dr. Bettes employment and resultant conflict of interest, his belief that American's former Dr. Bettes was perpetuating a new but closely related *"pilot disability cost savings"* scheme at Harvey Watt, and expressed his serious concern of the what appeared to be retaliatory threat to permanently terminate his LTD benefits.

186.     On June 3, 2015, Meadows, as a Pilot Employee and AAL shareholder, hand delivered a copy of his FAA AIR21 complaint to American's CEO, during its annual shareholder meeting. He also asked Mr. Parker for a meeting at Headquarters in Dallas.

187.     Mr. Parker agreed to meet Meadows "so long as the attorney's allow it.", so

Meadows walked across the room and proceed to ask Exec. VP of Corp. Affairs/General

Counsel Mr. Stephen Johnson, to set up such meeting. Mr. Johnson said he had not time for

this, turned his back and head out the door.

188.     Meadows remained hopeful, and immediately sent Mr. Parker a sincere thank you

letter, stating he would make himself available at a Mr. Parker convenience, However,

Meadows never received a response.

189.     American's response was to instead, have its lead bankruptcy counsel send a

retaliatory certified letter dated June 12, 2015; which demanding I dismiss my original SOX

complaint, my ADA lawsuit, and my new AIR21 and SOX Whistleblower Complaints, or ,

threatened to seek an injunction and sanctions to include legal fees and costs.

190.     Subsequently, on June 22, 2015, Meadows timely escalated and filed his FAA

AIR21 Whistleblower Complaint to the OSHA Regional Office in Fort Worth Texas, where

American is headquartered.

191.     On June 25, 2015, Meadows filed a new Sarbanes-Oxley Whistleblower

Complaint with the OSHA Regional Office in Fort Worth Texas, relating to American's very

recent *post-petition* securities fraud and retaliation.

192.     On July 2, 2015, Meadows filed a complaint #201550-09342,with the Dept. of

Labor, Employee Benefits Security Administration ("EBSA"). Wherein he complained of no-

notice interference and disruption of his disability benefits, procedural irregularities, and out

of date plan SPD documents, with respect to administration of American's 2002 Pilot Long

Term Disability Plan

193.     On July 13, 2015, American filed a Motion in the U.S Bankruptcy Court seeking
an Injunction to enforce its Plan, and specifically seeking an Order to, 1) dismiss, my NDI

ADA lawsuit, my original SOX proceeding, AIR21 action, and Whistleblower Action (2nd SOX complaint), 2) make nor further filings in those actions, and 3) enjoin me from further communications with American employees regarding any of those matters.

194.    Meadows believes American's bankruptcy counsels demand letter and subsequent motion was retaliation in the form if intimidation and harassing threats, to scare him from continuing his statutorily protected whistleblower activity

195.    Based on American's June 12th letter and its July 13th Motion, OSHA believed that American's threating letter and Motion amounted to interference in a government investigation, escalated American's demand letter and motion Meadows to the Solicitor's office of the Secretary of the DOL.

196.    On July 17, 2015 Meadows filed a new EEOC charge #440-2015-05468, alleging of disability discrimination and retaliation. He informed the investigator that American has engaged in ongoing systemic retaliatory and discriminatory practices, including but not limited to an enforcing an unlawful no-leave policy, denying requests for reasonable accommodation, and interfering with and denying employee benefits, which amounted to disability harassment and creation of a *hostile work environment*. He also alleged retaliation for opposing and reporting such unlawful practices to various government agencies.

197.    On July 31, 2015, the Chicago Office of the EEOC issued a Right to Sue Letter for charge #440-2015-05468. To the extent the *continuation violation* does not apply, then this Right to Sue Letter at a minimum allows Meadows to sue for all discriminatory and retaliatory conduct within the previous 300 days. (Exhibit 3).

### IV.    COUNT I: American Engaged In Disability Discrimination in Violation of the American's With Disabilities Act of 1990 As Amended ("ADA") 42 U.S.C. §12101
(As to American)

198.    Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

199.       Meadows is a *"Employee"* of defendant American Airlines, Inc., as defined under

the ADA, 42 U.S.C §12111(4), and a *"Pilot Employee"* as defined under the terms of the

CBA, Letter KK, and the *"Plan."*

200.       American as *"Employer"* and a *"Covered Entity"* under the ADA, 42 U.S.C

§12111 (2) and (5).

201.       Further, American is prohibited from discriminating in providing the terms,

conditions, benefits and privileges of employment, such as non-revenue travel or pension

benefits. See *Ralph v. Lucent Technologies, Inc.,* 135 F.3d 166, 171, 7 ADA Case. (BNA)

1345, 1349 (1st Cir.1998).

202.       In order to establish a prima facie case of *Disability* discrimination in violation of

the ADA, a Plaintiff must prove that (1) he has a *"Disability";* (2) he is a *"Qualified*

*Individual"*; and (3) he was discriminated against because of his disability. See *Harris v. H*

*& W Contracting Co.,* 102 F.3d 516, 519 (11th Cir.1996). See also, *Witter v. Delta Air Lines,*

*Inc.,* 138 F.3d 1366, 1369 (11th Cir . 1998).

203.       Meadows suffers from a psychiatric "Disability", which was verified by the Mayo

Clinic, and subsequently acknowledged by American's PBAC, in the award of his second

disability claim. Thus, under the ADA Amendments act of 2008 ("ADAAA"), Meadows

meets definition of disability, under first prong, for he has impairment that is episodic or in

remission is a disability that would substantially limit a major life activity when active. He

also meets the second prong, as he has a documented medical record of a *Disability.* Further

his Disability, is one of the few actually named in the Regulation.

204.       However, Meadows' disabling condition is currently treated into remission with

counseling and medication, but the ADAAA provides that determination of a *Disability,*

*"shall be made without regard to the ameliorative effects of mitigating measures, such as medication or hearing aids."*

205. Meadows meets the second prong, as he is a *"Qualified Individual"* under the ADA, 42 U.S.C §12111((8), who meets all of American's published *"Essential Job Functions of Pilot." Id.,* and for all other non-flying positions for which he has requested as an accommodation in the pilot bargaining unit.

206. Regardless, American engaged in a systemic discriminatory and retaliatory practices by enforcing unlawful *"No-leave"* policy, through subjective reinterpretation and selective enforcement of a "5 year maximum sick leave rule", which is strictly prohibited under the ADA. This practice has been ongoing, and still being enforced, enforcement of the ADA. As a result Meadows was improperly removed Meadows from the Pilot System Seniority List, and allegedly administratively separated.

207. As a result pilots like Meadows who suffer from psychiatric disabilities are harassed through not notice suspension and denial of disability benefits, and are denied Job Protection (i.e. Seniority number), and also denied important benefits and privileges of employment to include employee non-revenue travel passes.

208. *"EEOC Enforcement Guidance on the American with Disabilities Act and Psychiatric Disabilities",* (EEOC Notice Number: 915.02, date 3-25-07), plainly provides that an *"Employer must modify its no-leave policy, and provide additional leave...for treatment or recovery related to a disability."* , and that an, *"Employer must hold open an employee's job* [i.e. pilot seniority number] *if granted leave as a "Reasonable Accommodation" ."* and further that, *"Court's recognize leave, as a "Reasonable Accommodation" ."*

209.     Therefore, based on all the foregoing there exists *Prima Facie* evidence that

American has discriminated against Meadows on the basis of his *Disability* in violation of the

ADA.

210.     Accordingly, Meadows respectfully request the Court award the following,

reinstatement to his original relative position on the *"Pilot System Seniority List"*, a

*"Reasonable Accommodation"* of reassignment to a non-flying job in the pilots bargain unit,

reinstatement of non-revenue travel benefits, back pay and benefits, prejudgment interest,

punitive damages, emotional distress, compensatory damages, and legal fees and costs.

## V.     COUNT II: American Failed to Provide a Reasonable Accommodation In Violation of the American's With Disabilities Act of 1990 As Amended ("ADA") 42 U.S.C. §12101
### (As to American Airlines)

211.     Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

212.     <u>Meadows is a *"Employee"* of defendant American Airlines, Inc.,</u> as defined

under the ADA, 42 U.S.C §12111(4), and a *"Pilot Employee"* as defined under the terms of

the CBA, Letter KK, 2004 PLTD plan.

213.     American as *"Employer"* is a *"Covered Entity"* under the ADA, 42 U.S.C §12111

(2) and (5), and therefore its <u>*"duty to provide reasonable accommodation* [to a disabled</u>

<u>employee] *is an ongoing one."*</u> See *Ralph v. Lucent Technologies, Inc.,* 135 F.3d 166, 171, 7

ADA Case. (BNA) 1345, 1349 (1st Cir.1998).

214.     The 7th Circuit has established a three-part test for failure-to-accommodate

claims: In order to establish a prima facie for failure to provide a *"Reasonable*

*Accommodation"* in violation of the ADA, a Plaintiff must prove that; (1) the *"Employee"*

is a *"Qualified Individual"* with a *"Disability";* (2) the *"Employer"* is aware of the

"*Employee's*" "*Disability*"; and (3) the "*Employer*" failed to "*Reasonably Accommodate*" the "*Disability*". See *Bunn v. Khoury Enterprises, Inc.,* (7th Cir., No. 13-2292 ,May 28, 2014).

215.     Meadows meets the first prong, as he suffers from a psychiatric "*Disability*", which was verified by the Mayo Clinic, and subsequently acknowledged by American's PBAC in the award of his second disability claim. Thus, under the ADA Amendments Act Of 2008 ("ADAAA"), Meadows meets definition of disability, for he has impairment that is episodic or in remission is a disability that would substantially limit a major life activity when active.

216.     He also meets definition of having a disability, because he has a documented medical record of a psychiatric "*Disability.*" Further his '*Disability*", is one of the few actually named in the Regulation.

217.     However, Meadows' disabling condition is currently which is treated into remission with counseling and medication, but the ADAAA provides that determination of a *Disability, "shall be made without regard to the ameliorative effects of mitigating measures, such as medication or hearing aids."*

218.     Meadows condition is currently treated into remission and presently does not have any physical limitations or impairments.

219.     Meadows meets the second prong, as he is a "*Qualified Individual*" under the ADA, 42 U.S.C §12111((8), who meets all of American's published "*Essential Job Functions of Pilot.*" *Id.,* and for all other positions for which he has requested as an accommodation in the pilot bargaining unit.

220.     Meadows meet the third prong, as American repeatedly denied his post-commencement, repeated requests for a "*Reasonable Accommodation*" to a non-flying

position within the pilot bargaining unit; or alternatively for additional medical leave, to maintain his Job Protection (*i.e.,* pilot seniority number) until such time that he can obtain the FAA Airman's Medical Certificate) required to serve as an pilot in the cockpit of an aircraft.

221.     The only statutory limitation on an Employer's obligation to provide ""*Reasonable Accommodation*" " is that no such change or modification is required if it would cause *"Undue Hardship"* to the employer. See 42 U.S.C. § 12112 (b)(5)(A) (1994) ("it is a form of discrimination to fail to provide a 'Reasonable Accommodation', unless such covered entity can demonstrate that the accommodation would impose an undue hardship.").

222.     According to *"EEOC Enforcement Guidance: "Reasonable Accommodation" s and Undue Hardship",* (EEOC Notice Number: 915.02, October 17, 2002), *"Undue Hardship"* means significant difficulty or expense and focuses on the resources and circumstances of the particular employer in relationship to the cost or difficulty of providing a specific accommodation. Undue hardship refers not only to financial difficulty, but to *"Reasonable Accommodation"* that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business. *See* 42 U.S.C. § 12111(10) (1994); 29 C.F.R. § 1630.2(p) (1997); 29 C.F.R. pt. 1630 app. § 1630.2 (p) (1997).

223.     Meadows' request seeks vacant positions that's already exist in the pilots bargaining unit at American, and thus do not impose an *"Undue Hardship."*

224.     Moreover, American has had a longstanding past practice of contractually reassigning several other medically disqualified pilots, through its SLOA (Sick Leave Of Absence) Special Assignment jobs, to various non-flying positions within the pilot bargaining unit.

225.     The only distinction between Meadows and all those pilots who have been given SLOA Special Assignment jobs, is that he suffers from a psychiatric disabilities, and is a federal whistleblower.

226.     Significantly, recently the U.S. Supreme Court, denied United Airlines petition for certiorari review, and let stand the 7th Circuit's *En Banc* decision in *EEOC v. United Airlines, Inc.* (7th Cir. Sep 7, 2012); which held,

> "*The ADA does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified...or another option, such as providing an accommodation which allows the employee to remain in his or her current position.*"

227.     Regardless, American has steadfastly denied all of Meadows repeated requests for a *"Reasonable Accommodation."*

228.     *"EEOC Enforcement Guidance on the American with Disabilities Act and Psychiatric Disabilities",* (EEOC Notice Number: 915.02, date 3-25-07)*,* plainly provides that an *"Employer must modify its no-leave policy, and provide additional leave...for treatment or recovery related to a disability."*, and that an, *'Employer' must hold open an employee's job* [Job Protection, i.e. pilot seniority number] *if granted leave as a 'Reasonable Accommodation'."* and further *"Court's recognize leave, as a 'Reasonable Accommodation'."*

229.     Therefore, based on all the foregoing, there exists a *Prima Facie* case that American has discriminated against Meadows on the basis of his *"Disability"* in violation of the ADA.

230.     Accordingly, Meadows respectfully request the Court award restoration of his Job Protection (i.e; reinstatement to his original relative position on the *"Pilot System Seniority List"*) , *"Reasonable Accommodation"* of reassignment to a non-flying job in the pilots bargaining unit, reinstatement of non-revenue travel benefits, back pay and benefits,

prejudgment interest, punitive damages, emotional distress, compensatory damages, and legal fees and costs.

## VI. COUNT III: American Denied Meadows Prejudgment Interest On Untimely Payment Of Disability Benefits Payments Pursuant To ERISA, § 502(a)(3)(b), 29 U.S.C. §1132(a)(3)(B), (As to American Airlines)

231.  Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

232.  American Airlines, Inc. Pilot Long Term Disability Plan (*"Plan"*) is governed by ERISA.

233.  Meadows is a Participant who was and is eligible for payments provided under the "Plan".

234.  On December 13, 2011 Meadows was approved for his second claim disability benefits payable under the "Plan", albeit denying his claim for fours of retroactive benefits back through December 26, 2007.

235.  On August 20, 2012, Meadows timely filed an administrative appeal to American's Pension Benefits Administration Committee ("PBAC").

236.  Under both ERISA and the *"Plan"* SPD Documents the PBAC is required to render its final appeal decision within 45 days, or in this case Oct. 4, 2012, but American violated ERISA when it failed to timely decide Meadows appeal.

237.  On June 12, 2013, after numerous futile demands upon the PBAC for a final decision on his claim, Meadows finally resorted to filing an EEOC charge# 540-2013-01436 for disability discrimination and retaliation, and he also complained to EBSA.

238.  Finally, on July 31, 2013, some 345 days after Meadows filed his appeal, the PBAC awarded Meadows approximately four years of retroactive benefits, and agreed he

was entitled to disability payments (less any amounts already received), pension credited service, and active medical benefits retroactive to Dec. 27, 2007.

239.     On Sep 3, 4, and 5th, 2013, American paid Meadows three separate payments of $103,800.00, $98,000.00, and $82,400 respectively, totaling $284,200.00. Which represented the retroactive benefit payments owed him "Plan", excluding any interest.

240.     Therefore, Meadows is entitled have  to pre-judgment interest applied to American Airlines delayed payments of disability benefits to which he was timely entitled under the Employment Retirement Income Security Act ("ERISA") § 502(a)(3)(b),  , 29 U.S.C. § 1132(a)(3)(B).

241.     As a result of the American's failure to pay timely Meadows disability benefits, Meadows  depleted the money from his investment accounts, had borrowed money, and ran up credit card balances at exorbitant rates in a effort meet his family's  living expenses; ultimately Meadows lost his home to foreclosure.

242.     ERISA doesn't specify a pre-judgment interest rate.

243.     Historically, the weighted average annualized rate of return on Meadows investment accounts was  11.08% over the last five years from 2008-2013, was and 10.56% over the last 10 years from 2006–2012.  But for the American's delay in payment,  Meadows would not have divested his investments or liquidated them.

244.     Therefore, it is more appropriate to use  Meadows personal rate of return on 2007-2012 of 11.08% for the prejudgment interest rate, because it more fully compensates Meadows for the loss of benefit and use of the funds she would timely received. *See Osterneck v. E.T. Barwick Indus.,* 825 F.2d 1521, 1536 (11th Cir.1987), *aff'd sub nom.*

*Osterneck v. Ernst & Whinney*, 489 U.S. 169 (1989) (prejudgment interest should be awarded to compensate the prevailing party for not have the use of the money awarded as damages).

245.    There is legal precedent to pay such ERISA pre-judgement interest at a compensatory rate, and a district court has discretion to apply a reasonable rate. *See Blankenship v. Liberty Life Assur. Co.*, 483 F.3d 620, 627 (11th Cir. 2007). "[T]he interest rated prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Id.* at 628 (citing *Grosz v. Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001))

246.    Accordingly, pursuant to ERISA") § 502(a)(3)(b), 29 U.S.C. § 1132(a)(3)(B). Meadows respectfully request the Court award him prejudgment interest on the amount of his untimely paid disability benefits payments, calculated using his personal investment rate of return, starting from when he should have received his retroactive payment on December 13, 2011, through when he actually received it on September 5, 2013, plus interest accruing from that date on the pre-judgment interest to date, which is now approximately $66,000.  The final amount will be determined at trial.

### VII.    COUNT IV: American Improperly Denied Meadows Additional Benefits to Which He Was Otherwise Entitled Under ERISA §502(a)(1)(B), 29 U.S.C. § 11329a)(1)(B)
#### (As to American Airlines)

247.    Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

248.    American Airlines, Inc. Pilot Long Term Disability Plan (*"Plan"*) is governed by ERISA.

249.        Meadows is a Participant who was and is eligible for payments provided under the "Plan".

250.        From June 4, 2004 through December 26, 2007 Meadows was on long term disability benefits under the "Program", and was provided with Non-revenue travel.

251.        On December 13, 2011 Meadows was approved for his second claim disability benefits payable under the "Plan", albeit denying his claim for additional benefits, to include his claim for reinstatement of his previously enjoyed non-revenue travel benefits, as provided to other disabled pilot *"Plan"* participants.

252.        Under the terms of the "Plan" Meadows is consider an *"Employee"* and *"Pilot Employee"* who receives W-2 Compensation, and who is entitled to Active *"Pilot Employee"* benefits, such as medical, dental, life insurance, pension credited service, and travel benefits.

253.        The terms of the "Plan" further provide for payroll deductions of such non-revenue travel.

254.        On Dec. 11, 2012, Meadows long-time mental health care practitioner, submitted an updated psychiatric evaluation to AAMOHS, and stated in her prognosis,

> *"I do not believe that his condition would be adversely impacted by airline travel. There are no impairments or limitations that would prevent Mr. Meadows from Airline travel, and there would be no medical reason to restrict him from such travel."*

255.        On June 20, 2013, American's current disability claims reviewer, UTMB, provided opinions which only further supported that there that there is no reason to restrict my non-revenue airline travel. Forensic Physiatrist, Dr. Fuller opined, *"The Pilot's prognosis with regard to this condition is generally good..."*

256.     In fact during the past two plus years American has provided Meadows with limited non-revenue travel for the purpose of attending grievance hearings at company headquarters in Dallas.

257.     The long standing past practice is to provide non-revenue to other similarly situated disabled pilots who are receiving disability benefits under the *"Plan."*

258.     Accordingly, pursuant to ERISA §502(a)(1)(B), 29 U.S.C. § 11329a)(1)(B), Meadows respectfully asks that the Court order reinstatement of the additional benefit of non-revenue travel.

### VIII.    COUNT V: American Owes Meadows Attorney's Fees Pursuant To ERISA § 502 (g)(1), 29 U.S.C. § 1132(g)(1),
(As to American Airlines)

259.     Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

260.     American Airlines, Inc. Pilot Long Term Disability Plan (*"Plan"*) is governed by ERISA.

261.     Meadows is a Participant who was and is eligible for benefits provided under the "Plan".

262.     On December 13, 2011 Meadows was approved for his second claim disability benefits payable under the "Plan", albeit denying his claim for fours of retroactive benefits back through December 26, 2007.

263.     On August 20, 2012, Meadows timely filed an administrative appeal to American's Pension Benefits Administration Committee ("PBAC").

264.     Under both ERISA and the *"Plan"* SPD Documents the PBAC is required to render its final appeal decision within 45 days, or in this case Oct. 4, 2012, but American violated ERISA when it failed to timely decide Meadows appeal.

265.     On June 12, 2013, after numerous futile demands upon the PBAC for a final decision on his claim, Meadows finally resorted to filing an EEOC charge# 540-2013-01436 for disability discrimination and retaliation, and he also complained to EBSA.

266.     Finally, on July 31, 2013, some 345 days after Meadows filed his appeal,  the PBAC awarded Meadows approximately four years of retroactive benefits, and agreed he was entitled to disability payments (less any amounts already received), pension credited service, and active medical benefits retroactive to Dec. 27, 2007.

267.     On Sep 3, 4, and 5th, 2013, American paid Meadows three separate payments of $103,800.00, $98,000.00, and $82,400 respectively, totaling $284,200.00. Which represented the retroactive benefit payments owed him *"Plan"*, excluding any interest.

268.     As the result of having to enforce his rights for retroactive ERISA benefits payable under the plan Meadows incurred substantial legal fees and costs.

269.     Accordingly, pursuant to ERISA § 502 (g)(1), 29 U.S.C. § 1132(g)(1), Meadows respectfully request he be awarded attorney fees in the amount of  $94,723.66, based 33.33% of $284,200 retroactive payment award.

### IX.    COUNT VI: American Breached Meadows Rights Under The Collective Bargaining Agreement, Necessitating Judicial Determination of Meadows Grievances 12-011 and 13-064
(As To American Airlines)

270.     Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

271.     American is an air *"carrier"* as defined under Railway Labor Act ("RLA").RLA § 1 First, (45 U.S.C. §151).

272.     Meadows is a member of the class and craft of pilots represented by defendant APA, and an *"Employee"* of defendant American Airlines, Inc., and as defined under U.S.C 45 §151- Fifth. RLA.

273.     APA placed Meadows in MDD (Medical Disability Dropped) status effective 10/24/2011, and does not consider MDD pilots such as Meadows to be members of APA, who are not entitle to benefits, and not owed a duty of fair representation.

274.      Meadows has alleged that American violated the terms and working conditions relating to his employment in violation of the CBA.

275.     On February 4, 2014, Meadows individually filed Grievance 12-011 complaining of his improper removal from the pilot seniority list, and discharge from American Airlines in violation of the collective bargaining agreement.

276.     On October 31, 2013, Meadows individually filed Grievance 13-064, protesting his removal from the pilot seniority list and termination citing specific violations of the CBA Sec. 13 "Seniority" and Sec. 11.D.1 "Leave of Absence."

277.     Such Individual Grievance disputes, involving are considered *minor disputes*, of subject to exclusive jurisdiction of a RLA System Board Of Adjustment.

278.     The RLA, provides that all *"minor disputes"* arising between an employee and a air carrier under Section 3 (45 U.S.C. §153), be handled in usual manner under Section 204 (45 U.S.C. §184), and arbitrated to System Board of Adjustment.

279.     Accordingly, Meadows requested his grievance be handled in the usual and customary manner of arbitration before a RLA System Board, as is his individual statutory right under 45 U.S.C. § 184 , but APA refused to do so.

280.    Meadows has made diligent efforts to arbitrate his grievances, after APA refusal, he filed a hybrid lawsuit in the Utah district court to seek injunctive relief to compel arbitration of his grievances before a RLA System Board.

281.    During its bankruptcy proceedings in April 2014, American admitted that Meadows grievance should move forward to arbitration, and specifically requested the court enter an order stating in part;

> *"Meadows shall be permitted to arbitrate Grievance 12-011 before the System Board to the extent that such arbitration is limited in scope to claims involving the interpretation of the CBA and provides remedies, if any and if appropriate, that are customary under the grievance procedures created by the RLA..."*

282.    However, in its 12(b)6 Motion to Dismiss Meadows hybrid lawsuit in the Utah district court, American, took an inapposite position, and sided with APA's argument that Meadows is not entitled to arbitrate his grievance.

283.    In fact Courts in several other circuits, including the 7th Cir. have found such a statutory right to arbitration under the RLA to exist. See *Santiago v. United Airlines* (NDI, 11-09109, Dec, 2014),

284.    Unfortunately, the Utah Court ignored that well-settled case law, and instead Utah Court instead relied upon APA's General Counsel's misrepresentation that because Meadows was a member of APA, he was bound by its C&B, and therefore ceded his right to APA to resolve his grievances in its sole discretions.

285.    The Utah Court granted APA's and Americans' Motions to Dismiss, and thereby deprive Meadows of his statutory right to arbitration of his grievances to a System Board.

286.    APA's General Counsels misrepresentation has since been proven to be patently false, through APA' own official Board of Directors minutes sand directives, which show

that APA General Counsel had firsthand knowledge that APA did not consider Meadows to

be member prior to its contrary misrepresentations made to the Utah Court.

287.    To be certain, Judge Gary Finerman of the Northern District of Illinois found that

he flight attendant in *Santigao Id.* as an employee under RLA, *"had the right to demand*

*arbitration before a System Board."* See 969 F. Supp 2d at 966-69, and Meadows believes he

also should be provided such right.

288.    However, Judge Finerman further opined that;

> The Supreme Court has held that federal courts may take jurisdiction over even
> "minor" disputes under circumstances "where the effort to proceed formally with
> contractual or administrative remedies would be wholly futile." *Glover v.*
> *St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 330 (1969). Without the AFA's
> support, it is unclear whether Santiago would have had an effective means of
> vindicating her rights in the internal grievance proceedings. *See id.* at 327
> (holding that judicial intervention is warranted where the company and the union
> "are working 'hand-in-glove'" to thwart the employees'
> efforts). Consistent with *Glover*, in *Brotherhood of Railway, Airline & Steamship*
> *Clerks v. Atchison, Topeka & Santa Fe Railway Co.*, 847 F.2d 403 (7th Cir.
> 1988), the Seventh Circuit noted that federal courts may take "jurisdiction in
> cases in which the extrajudicial dispute-resolution framework of the RLA is either
> unavailable or ineffective," such as when both the employer and the union are
> adverse to the employee. *Id.* at 410-11;

289.    Here in Meadows case is a situation where the company and the union, have

overtly worked hand in glove to thwart Meadows efforts to have his grievances arbitrated,

making efforts to adjudicate his grievances wholly futile. *Glover v. St. Louis-San Francisco*

*Ry. Co.*, 393 U.S. 324, 330 (1969), leaving him without a forum in which to present his

grievances.

290.    The RLA also reflects a strong congressional interest in seeing that employees

like Meadows, are not left *"remediless"* and without a forum to present their grievances. Cf.

*Vaca v. Sipes*, 386 U.S. 171, 185-86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

291.     Accordingly, Meadows seeks judicial intervention, for this Court to fully

adjudicate Meadows Grievances 12-011 and 13-064 on the merits, and be provided any and

all make whole remedies which he would normally be provide under the RLA, including

but not limited to back pay/benefits, interest, reinstatement of his non-revenue travel

benefits, reinstatement of his original relative positon on the Pilot System Seniority List,

reassignment to a non-flying job in the pilot's barraging unit, and any other releief this

Court deems just and proper.

### X.     COUNT VII:  American Retaliated Against Meadows For Engaging In Protected Whistleblower Activity in Violation Of Section 922 of  Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), 15 USC § 78u-6(a)(6)
(As to American Airlines and Marjorie Powell)

292.     Plaintiff incorporates by reference the foregoing paragraphs as fully set forth

herein.

293.     Meadows is an *"Employee", "Pilot Employee",* and shareholder of Defendant

American Airlines.

294.     As a result of engaging in protected whistleblower reporting activity, Meadows

provided disclosures protected under the Sarbanes-Oxley and Dodd-Frank Acts, and has

suffered several adverse consequences relating to the terms, conditions, and privileges of

employment, and his reporting activity was a contributing factor to the adverse actions

which he has suffered.

295.     Meadows reasonably believed American has engaged in new but closely related

acts of securities fraud, through prepetition of Americans' *"pilot disability cost savings"*

scheme, through its former Corporate Medical Director who is currently employed by

American's' new supposedly "independent" third party disability claims Reviewer.

296.     Meadows also reasonably believes that Americans' Senior Attorney Marjorie

Powell, have engaged in various from of corporate fraud to cover up Americans'

participation in has engaged fraud related to its disability benefits programs, and unlawful

systemic discriminatory and retaliatory practices and acts taken against Meadows and other

similarly situated disabled *"Pilot Employees"*

297.     Most recently, on February 18, 2015, April 15, 2015, May 5, 2015, and June 3,

2015, Meadows has engaged in protected reporting activity under the Dodd-Frank and

SOX acts, whereby he has reported the corporate and securities and corporate fraud he

reasonably believed Company Manger's, Company Counsel, and Corporate Executives,

and various government agencies.

298.     Staring on April 24, 2015, American suspend payment of Meadows W-2

compensation without notice.

299.     On May 6, 2015 Americans' counsel mischaracterize Meadows May 1st

voicemail to Ms. Powell, wherein he made a settlement proposal, as *"harassing"* and

*"threatening"*, and threatened Meadows with criminal charges and legal sanctions, and

forbid him to communicate with employees of American.

300.     On May 7· 2015 American's "Plan" administrator threatened to terminate

Meadows disability benefits.

301.     On June 12, 2015, just one week after Meadows hand delivered his Federal

Aviation Administration ("FAA") AIR21 Whistleblower compliant to American's CEO at

the annual shareholder meeting, Americans' bankruptcy counsel sent Meadows a certified

letter demanding he dismiss his EEOC lawsuit pending in this Court, and his original SOX

proceeding, and his AIR21 whistleblowers complaint. The letter otherwise threatened

Meadows with an Injunction, sanction, legal fees and costs against Meadows.

302.     On June 26, 2015, Americans' newly retained employment counsel contacted

Meadows regarding this EEOC lawsuit, and has subsequently made and appearance before

this court, and respond to Meadows lawsuits EEOC discrimination and retaliation claims

for violations of the ADA.

303.     Regardless,  on July 13, 2015, American's Bankruptcy counsel filed a 614 page

Motion in the U.S. Bankruptcy Court, SDNY, seeking an Injunction to enforce the

bankruptcy plan against Meadows, and unlawfully him to dismiss all of his *post-

commencement* claims against American, and enjoin him from filing any further actions, or

communicating with other employees.

304.     Further, Americans' bankruptcy court Motion also seeks and bar him from

speaking to any other employees regarding his litigation in violation of his 1st Amendment

Right of Free Speech, and hamper his effort as founder of the Disabled Airline's Pilots

Foundation ("DAPF"), which supports and assist similarly situated disabled airline pilots.

305.     Meadows believes that Motion is outrageous, and further retaliation, harassment

and intimidation, and also amounts interference in his government complaints, and seeks to

deprive him of his statutorily protected whistleblower rights,

306.     On information and belief Meadows believes Ms. Powell's employment with

American is in jeopardy as the result of her unethical and unlawful conduct,  which wa s

reported by Meadows, and she and that others in management have directed retaliatory acts

against Meadows, and in so doing have violated his  Dodd-Frank protections, specifically

prohibiting  that a employer cannot; *" Discharge, demote, suspend threaten harass, directly*

*or indirectly, or in any other manner discriminate against",* a whistleblower because of his protected activity.

307.        Accordingly, pursuant to Section 922 of Dodd-Frank Act, 15 USC § 78u-6(a)(6), Meadows respectfully request this Court, award Meadows two times back pay/benefits with interest, reinstatement to the seniority list, reinstatement of his non-revenue travel benefits, reassignment to a non-flying position in the pilots bargaining unit (or forward pay in lieu of that), emotional distress, punitive damages, compensatory damages, expert fees, and legal fees and cost, and other such relief that this Court deems just and proper.

### XI.   COUNT VIII: Civil Conspiracy Collusion To Strip Meadows Of His Substantial Rights
(As to American Airlines, Allied Pilots Association, and Marjorie Powell)

308.        Plaintiff incorporates by reference the foregoing paragraphs as fully set forth herein.

309.        A actionable civil conspiracy exists, when; a combination of two or more persons, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, which results in damage.

310.        APA and American have a history of colluding with each other to unlawfully dispose of individual pilot grievances without notice to the affected pilots, in direct violation of their individual statutory rights under the Railway Labor Act ("RLA").

311.        Judge Finerman , of this district court  opined in *Santiago v. United Airlines* (NDI, 11-09109, Dec, 2014), that;

> *"Nothing in § 184 suggests that the union and employer could agree to place a limitation upon an individual employee's right to unilaterally seek relief before an adjustment board.* In *Capraro v. United Parcel Service Co.,* 993 F.2d 328 (3d *Cir. 1993), however, the Third Circuit read § 184 in the same way as this court:"*

> [T]he grievance and arbitration process is not optional under the RLA. Congress intended the RLA's procedures, particularly the Adjustment Boards, to be the

exclusive means of dealing with minor matters involving the interpretation of a collective bargaining agreement and for all aggrieved employees to have access to such procedures. It necessarily follows that an employer and a union, through a negotiated collective bargaining agreement [or any side agreement], cannot deprive a category of employees of access to the grievance and arbitration process. <u>Thus, if the collective bargaining agreement [or side agreement} here is read to deny such access, the relevant clauses, to that extent, are invalid and unenforceable.</u>

312. Thus, an air carrier and union may not enter a side agreement which deprives employees of their right arbitrate their grievances to a System Board of Adjustment under the RLA, 45 U.S.C. § 181. See *Caprao Id.*

313. Yet, on November 16, 2012 American and APA entered a Bankruptcy Settlement Agreement, in exchange for APA disposing of some 220 out of 260 pending pilot grievances.

314. The affected pilots were never provided notice that APA unilaterally disposed of their grievances, nor did they consent to such act.

315. As direct inducement for signing the Settlement American paid APA $21.5M in stock and cash to defray APA's bankruptcy related expenses, which only amounted to $10.5M. So APA netted almost $11M for selling out its 220 pilot grievances.

316. Fortunately, Meadows grievance was one only 36 that were survived – or so it would seem, and was excluded from the bankruptcy settlement, which American and APA incorporated CBA, and explicitly referenced it in LOA 12-01.

317. On April 24, 2013, APA Legal department even informed Meadows in writing that they supported the SOX claim portion of his grievance, and that as a matter of equity he should be made whole.

318. However, on February 28, 2014 Ms. Powell also informed Meadows that she believed his personal proof of claim was untimely, and thus his *pre-petition* ADA and SOX claims was not timely preserved in American's bankruptcy proceedings, and threatened that

unless he dismissed his SOX ALJ proceeding American would file an Objection to get it disallowed, forcing him to fly to New York and spend a lot of money.

319.     Meadows informed Ms. Powell his claims were in fact timely preserved – by the APA. Specifically, because the APA's timely proof of claim preserved Meadows Grievance 12-011, which explicitly included his SOX and ADA claim.

320.     Just one week later, on March 7, 2014, despite being noticed directly by Meadows and via his Utah hybrid lawsuit to continue to preserve grievance 12-011, APA suddenly amended its proof of claim without notice, and excluded  Grievance 12-011.

321.     On information and belief Ms. Powell and others at American, had colluded with Officers and Agents of APA, to eliminate Meadows Grievance 12-011 from APA's proof of claim, in order to invalidate Meadows SOX claim to the benefit of American Airlines.

322.     APA would also benefit, as the $5.6M value of Meadows Grievances would essentially be a net credit to the bankruptcy settlement reserve fund, of which APA is entitled to 13.5%.

323.     Further on information and belief this was a disingenuous attempt by APA working hand in glove with American, to mislead the bankruptcy court that Meadows Grievance 12-011(and its associated SOX claim) was fully disposed of.

324.     When in fact it was not, and was incorporated into the 2013 CBA, and most recently was and still is incorporated in to the January 31, 2015 version of the pilot's CBA.

325.     Moreover, it appears that APA wanted unwind its explicit previous support and its own timely preservation of Meadows SOX claim (via its explicit reference in Grievance 12-011), was insure to American's benefit and to Meadows detriment.

326.     On March 6, 2014, the Dept. of Labor ALJ issued Order Rescheduling Hearing (for Aug.18, 2014) and Revised Pre-hearing Schedule, which reopened discovery.

327.     On March 17, 2014, as per Ms. Powell's threat, American filed an Objection in the bankruptcy court, seeking to disallow all of Meadows' claims including his EEOC charge containing his ADA claim. Meadows timely filed a Response.

328.     On April 14, 2014, U.S. Bankruptcy Court held a hearing into Americans Objection of Meadows' claims.

329.     During that hearing despite previously asserting Meadows was not a member and not owed a duty, APA's General Counsel, Steve Hoffman, and special Bankruptcy counsel, Joshua Taylor, made a no-notice appearance and argued against Meadows interest.

330.     Mr. Hoffman, misrepresented to the court that the APA did support Meadows SOX claim, and as a result the bankruptcy court determined that Meadows original SOX compliant was not preserved by APA's preservation of Grievance 12-011.

331.     As a result the bankruptcy Court disallowed Meadows SOX claim which had valuable make whole remedies valued by Meadows economist to be worth $5.6M.

332.     Additionally as more fully described Count VI, American, Ms. Powell, and APA, have *worked hand in glove* and colluded to prevent Meadows from excersing his statutory right to arbitrate his grievances before a RLA System Board, 45 U.S.C.

333.     As a direct result of Americans' and Ms. Powell's collusion with APA, Meadows has suffered substantial harm, because he was stripped of his valuable grievance and SOX claims consisting of valuable monetary rights relating to his pay, benefits, pension and stock, and no-monetary statutory rights of reinstatement of seniority and his job.

334.     Accordingly, Meadow respectfully request the Court award any and all relief to which Meadows is entitled under federal civil conspiracy statutes, to include punitive damages, and any other relied  that this Court deems just and proper.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Lawrence Meadows, prays for a judgment against the Defendants for the relief as plead herein, and for such other equitable relief as this Honorable Court deems just and proper.

Dated: this 3rd day of August, 2015            Respectfully submitted,

Lawrence M. Meadows, Pro Se
203 N. LaSalle St.
Suite 2100
Chicago, IL  60601
Telephone: (312) 917-6214
Facsimile: (435) 604-7850
lawrencemeadows@yahoo.com

**Certificate of Service**

**I hereby certify,** that a true and correct copy of the foregoing was served by U.S. Mail on August 3, 2015, on all counsel or parties of record on the Service List below.

_____
Signature of Filer

**SERVICE LIST**

**American Airlines, Inc.**

**Mark W. Robertson, Esq.**
**Daniel S. Shamah**
O' Melveny & Meyers, LLP
Times Square Tower
7 Times Square
New York, NY 10036

**Colleen G. DeRosa**
Ogletree-Deakins, P.C.
155 North Wacker Driver
Suite 4300
Chicago, IL 60606

# EXHIBIT 1

**AMERICAN AIRLINES JOB DESCRIPTION
AND ESSENTIAL FUNCTIONS**

**Revision: 03/01/10**

_____

**Position:     Pilot \***

This description has been designed to indicate the general nature and level of work performed by employees within this job classification.  It is not designed to contain or be interpreted as a comprehensive inventory of all duties, responsibilities, and qualifications which may be required of employees assigned to this job classification.

<u>Job Description</u>

Reports for duty before assigned flight.  Access computer terminals for sign-in and acquisition of flight plans, weather information and other associated documents.  Analyzes in concert with Flight Dispatch, the plan of intended routing and fuel loading taking into account weather and other conditions.

Conducts detailed examination of exterior and interior of aircraft, operating and testing various systems and components.   Reviews any discrepancies and determine whether aircraft is acceptable for safe flight operation.

Completes pre-flight checklists (manually & visually), contacts FAA by radio to acquire clearances and brief flight attendants.

Supervises push-back activities and taxi aircraft to runway.  Communicates with appropriate FAA facilities and complete additional system tests and checklists as required.

During flight, performs checklist, visually monitors aircraft systems, communicates with FAA facilities, navigates and monitors air traffic.  Simultaneously, monitor enroute weather, and alter routing as necessary while continually analyzing fuel consumption.  In the event of abnormal or emergency situations, take immediate required action and determine if immediate landing is necessary.

Plans and executes approach and landings, often at night and in inclement weather.  In the event of inclement weather, use instrument flight rules to land or divert to an alternate airport and plan fuel usage accordingly.

Taxis aircraft to gate, shut down engines and prepare for the next flight segment.

Must be able to work varying hours of the day or night, on weekdays, and holidays.  Frequently on duty for as long as twelve to fourteen hours and will span many time zones and extreme weather differences in the course of a trip.  Frequently be away from home for three, or more days and nights, staying in
out-of-town hotels.

**Pilot (continued)**

## Job Requirements

Requires good communication skills, adaptable personality, quick and accurate decision making and close attention to detail.

Must fulfill FAA criminal background checks to qualify for unescorted access privileges to airport security identification display areas (SIDA).

Must be able to secure appropriate airport authority and/or US Customs security badges.

| | |
|---|---|
| Age: | At least 21. |
| Height: | Height required to fully operate and actuate all controls and other equipment at each crewmember position of all aircraft operated by American Airlines. |
| Visual Acuity: | Corrected to 20/20. |
| Weight: | In proportion to height. |
| Education: | College degree or equivalent is preferred. |
| Citizenship: | U. S. citizen or appropriate documents; however, the applicant must be able to read, write, fluently speak and understand the English language.  Valid passport required. |
| Certificates, ratings, and permits: | • FAA Commercial License (with instrument rating) or Air Transport Rating, multi-engine, with an instrument rating, no limitations.<br>• Flight Engineer Certificate or Flight Engineer Basic & Turbojet or FEX written examinations passed within the last 24 months.<br>• Valid FCC Restricted Radio Telephone Operator permit.<br>• Valid First Class Medical Certificate (explain restrictions). |
| Flight Time: | Commensurate with other qualifications. |

## Essential Job Functions

- Stand, sit, stoop, crawl, walk and sometimes run.
- Understand basic concepts of math, physics, navigation, airplane systems and aeronautics.
- Discern and interpret cockpit instruments (Analog and Digital) and appropriate color coding.
- Reach and manipulate various controls such as control column, control wheels, rudder pedals, valves, push buttons, switches and keyboards.
- Perceptually determine the correct placement of switches, valves, handles, and any other controls.
- Ability to hear instructions and clearances in a cockpit environment.
- Ability to hear crew responses in a cockpit environment.
- Reach, push, or pull objects located in cramped quarters or accesses.
- Communicate orally within a cockpit environment to clearly convey procedures, conversation, and radio transmissions.
- Observe and understand cockpit audio communications with and without a headset or from a cockpit speaker.
- Capability of decision-making under stress.
- Memorization of various pieces of technical data and specified procedures.
- Conduct operations in a dimly lit cockpit environment for night operation.
- Ability to read publications and documents, often in a dimly lighted cockpit.
- Ability to see other airplanes.
- Ability to work in close quarters.
- Ability to work at heights.
- Ability to detect burning substances, kerosene, gasoline, and hydraulic odors     as well as peculiar odors not normally found in the airplane cockpit through use of the senses.
- Ability to read computer screens and microfiche files.
- Ability to override jammed or manually operative flight controls in emergency situations.
- Lifting or moving of heavy objects such as life rafts or other emergency equipment.
- Ability to operate and reset emergency exit handles.
- Ability to open and close airplane doors and hatches.
- Ability to evacuate the airplane in an emergency from available exits.
- to understand and accomplish dynamic tasks.
- Methodical, analytical and systematic thought processes.
- Ability to work cooperatively with crewmembers, peers, supervisors and passengers of diverse nature who may hold divergent views.
- Provide instructions in a clear, concise and grammatically correct form
- Carry a kitbag, weighing approximately forty pounds and suitcase whileclimbing a widebody jetbridge stairway, stow kitbag in belly on certain aircraft types.
- Climb or descend steep or narrow passageways.
- The ability to adapt to diversified flight schedules, situations, or scenarios.
- Persuasiveness in constructively encouraging peak performance and in providing optimal solutions required in normal and emergency operations.
- Ability to open window and evacuate cockpit via a rope in an emergency.
- Ability to complete training in ditching and emergency procedures.
- Report to work on a regular and timely basis.

**Pilot (continued)**

**Statement of Understanding**

I have read and understand the position description and essential functions provided to me for the above position. By my signature, I confirm that I:

(Please check one of the following)

_____✓_____    Can perform all of the essential functions of the position.

_____    Cannot perform all of the essential functions of the position.

I also understand this is not a job offer nor is it intended to be any guarantee of future employment opportunities.

_____        8/3/2015
Applicant Signature                                          Date  Since August 5th, 2011

_____        _____
Company Representative Signature                     Date

\*This job is subject to Department of Transportation (DOT) drug and alcohol testing. Your previous employers will be contacted to verify if you had any DOT drug violations and/or refusals to test for drugs or alcohol in the previous two year period. Your DOT required urine specimen will be tested for the following substances: Cocaine, Marijuana, PCP, Amphetamines and Opiates.

# EXHIBIT 2

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Lawrence M. Meadows<br>P.O. Box 4344<br>Park City, UT 84060 | From: | Phoenix District Office<br>3300 North Central Ave<br>Suite 690<br>Phoenix, AZ 85012 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 540-2012-03194 | Lucy V. Orta,<br>Enforcement Supervisor | (602) 640-5055 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_____        JAN 3 0 2015

Rayford O. Irvin,
**District Director**                              *(Date Mailed)*

Enclosures(s)

cc:   **Melissa Romig**
      **Sr. Attorney**
      **AMERICAN AIRLINES**
      **PO Box 619616, MD-5141**
      **Dfw Airport, TX 75261**

# EXHIBIT 3

EEOC Form 161-B (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Lawrence Meadows**
**203 N. Lasalle St., Ste 2100**
**Chicago, IL 60601**

From:  **Chicago District Office**
**500 West Madison St**
**Suite 2000**
**Chicago, IL 60661**

☐  *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2015-05468** | **Cristina Wodka,**<br>**Investigator** | **(312) 869-8096** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** **WITHIN 90 DAYS** **of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐  More than 180 days have passed since the filing of this charge.

☒  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court** **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for **any violations that occurred** **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

*Julianne Bowman*
**Julianne Bowman,**
**District Director**

7-31-15
*(Date Mailed)*

cc:  **Karen Gillen**
**Associate General Counsel**
**US AIRWAYS, INC.**
**111 West Rio Salado Parkway**
**Tempe, AZ 85281**